2014 VT 36

## State of Vermont v. Kyle Bolaski

[95 A.3d 460]

No. 12-036

Present: **Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.**

Opinion Filed April 25, 2014

*William H. Sorrell*, Attorney General, and *David Tartter*, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Matthew F. Valerio*, Defender General, *Anna Saxman*, Deputy Defender General, Montpelier, and *William A. Nelson*, Middlebury, for Defendant-Appellant.

¶ 1. **Dooley, J.** Defendant Kyle Bolaski appeals from his conviction for second-degree murder after a jury trial. He argues that the trial court erred in (1) not instructing the jury that, to find second-degree murder, the jury had to find an absence of passion or provocation; (2) excluding evidence of the victim's mental health history in the months before the incident; and (3) dismissing a juror during the trial because she reported having followed the case during the time of the grand jury. We do not reach the juror issue, and reverse and remand for a new trial.

¶ 2. The basic background to the case, derived from testimony at trial, is as follows. As there were a large number of witnesses and their testimony was not entirely consistent, we summarize the largely undisputed facts in as general terms as possible. Where the factual disputes are important to this appeal, we will highlight those disputes in the following discussion.

¶ 3. The victim, Vincent Tamburello, a native of Boston, was living at the time of these events in Springfield, Vermont at the home of his girlfriend's mother. While in Springfield, he interacted with a number of persons who were acquaintances or friends of his girlfriend. These encounters grew increasingly hostile, including an incident in which the victim took marijuana without paying for it and an incident in which the victim had a physical fight, hitting another person on the jaw and knocking him to the ground. The latter occurred when a group of persons encountered the victim outside the house where the victim was living. This event led, in turn, to a confrontation at a softball field in Chester, Vermont. Defendant and his brother Corey were recruited to be part of that encounter, although they had not previously met the victim.

¶ 4. Defendant and others arrived at the ball field at around 7 p.m. on August 17, 2008. Soon after defendant's truck arrived, the

victim arrived with his girlfriend and her friend. The group, including defendant, started approaching the victim's car, engaging in shouting with the victim. They were unarmed. The victim exited his vehicle holding a taser[1] and sparking it. The group continued to approach. The victim then threw the taser into the car and pulled out a splitting maul from the back seat. He raised it and charged at the approaching group, which scattered and ran away.

¶ 5. For unknown reasons, the victim chose to chase defendant to his truck that was some distance away. Once they reached the truck, the victim began hitting the truck with the maul. Defendant was able to enter the truck, where he obtained a rifle. Under highly disputed circumstances, defendant twice shot the victim, once in the leg and once in the buttocks. The victim bled to death from the second shot.

¶ 6. Defendant admitted to having fired the two shots, but maintained that he acted in self-defense. The State disagrees. Given these positions, the events that occurred after defendant and the victim reached the truck became the center of the trial. There were significant conflicts in the testimony, especially in the description of what occurred between the first shot and the second shot. In a statement that was introduced at trial, defendant described that the victim kept coming at him "like a madman," even after he was hit once in the leg. Some witnesses testified that the victim kept approaching defendant with the splitting maul after the first shot, whereas others testified that the victim retreated. One witness had previously stated that "it looked like he was coming at him, still a threat, when [defendant] fired the second shot," but then declined to endorse this statement at trial, even when confronted with that statement. A number of witnesses testified that after the second shot, defendant yelled, "It was self-defense!" and proceeded to either kick the victim or hit him with the butt of his gun.

¶ 7. The medical examiner testified to two entrance wounds from the bullets — one that entered in the front of the victim's inner left thigh, and another that entered the left buttock, just below the waistline, and exited the front pelvic area, suggesting a

---

[1] There is a certain amount of disagreement throughout as to whether, on the various occasions mentioned, victim had a taser or a "stungun." We do not find this distinction important.

downward trajectory. The victim died from the gunshot in his buttock, which passed through blood vessels and organs in the left side of the pelvis, causing him to bleed to death. The defense called an expert witness to testify that these wounds would be consistent with the testimony that the victim was approaching and facing defendant when the shot was fired, given the delay of slightly under one second between "a visual event that requires a decision, the making of that decision, and the finger movement." The medical examiner also testified to injuries on the victim's face and head, including fractures inflicted by a blunt object in the eye area of the skull. A toxicology report was admitted; it showed the presence of a number of drugs in the victim's blood and urine, including Xanax, THC, methadone, Paxil, Restoril, Oxazepam, and cannabinoids.

¶ 8. The above paragraphs describe the most important evidence that was presented at trial. Defendant sought, however, to present additional evidence relating to the victim's mental health during the two months prior to these events. This evidence was obtained by a subpoena to Springfield Medical Care Systems. The State filed a motion in limine to exclude this evidence, and the court granted it. The trial court had previously sealed the records obtained by the subpoena pursuant to the patient's privilege contained in 12 V.S.A. § 1612. In a follow-up order, it sealed depositions of medical care providers taken by defense counsel. The court's decision on the motion in limine was filed under seal. Because the exclusion of the evidence is one of the issues on appeal, the briefs and printed cases for this appeal were submitted under seal. For reasons described in our discussion of the evidentiary issues later in this opinion, we choose not to break the seal.

¶ 9. In its motion in limine, the State argued that the evidence to be sealed constituted propensity evidence impermissible under Vermont Rule of Evidence 404(b), that it was privileged and of "marginal relevance," and that "the probative value of this evidence is greatly outweighed by the danger of unfair prejudice." Defendant responded that the evidence was entirely relevant to understanding the victim's actions on the day of his death, and argued that it was not to be admitted to show propensity but instead to provide "circumstantial evidence of [the victim]'s motives for going to the ball field and his state of mind when he began his attack on [defendant], an individual whom he had never

met before, with a splitting maul." The State's motion was granted, and the trial court declined to admit any medical evidence concerning the victim prior to and including the victim's medical care received on August 14, 2008.

¶ 10. Accordingly, the evidence related to the victim's mental health was not presented at trial. Defendant argued self-defense throughout, saying that defendant was frightened for his life and aimed only to disable the victim. In closing, defense counsel relied heavily on the testimony of those witnesses who stated that the victim was still advancing on defendant before the second shot, and emphasized the lessons of the expert testimony, including the "fight or flight" impulse and the nearly-a-second reaction time between making a decision and pulling a trigger. He also referred to the toxicology report, stating that "[the victim has] all of these drugs with various combinations mixing around his urine and his blood at the time that he initiates the attack at the ball field," but did not refer to any of the information excluded by the order on the motion in limine that may have explained how those drugs affected the victim in particular.

¶ 11. The prosecution, for its part, argued strongly against self-defense and suggested that the testimony of the witnesses whose accounts were more consistent with defendant's as to the victim's last actions was biased, had initially been inconsistent, and had come to reflect the "party line." The prosecutor urged the jurors to use their common sense when evaluating the various witnesses' testimony, suggesting that the "party line" simply did not make sense. The prosecutor also argued that the jury could draw no inferences from the toxicology report, stating that "you have zero testimony on how that might have affected anybody's behavior."

¶ 12. The jury was instructed on the elements of the charged offense of second-degree murder, and then received a transition instruction to the lesser-included offenses of voluntary manslaughter and involuntary manslaughter. The transition instruction stated:

> If you decide that the State has not proven each of the essential elements of second-degree murder then you must consider whether [defendant] is guilty of one of the lesser offenses . . . . Or if you are unable to agree upon a verdict concerning the charge of second-degree murder . . . then you may move on to consider the lesser offenses.

Although the instruction regarding voluntary manslaughter explained that the difference between second-degree murder and voluntary manslaughter was the existence of "extenuating circumstances, such as sudden passion or great provocation," the second-degree murder charge did not explain that the existence of passion or provocation would mean that second-degree murder had not been proven. Defense counsel did not object, and the jury found defendant guilty of second-degree murder.[2]

¶ 13. After the conviction, defendant moved for a new trial on three grounds. The first was the trial court's ruling on the motion in limine, which excluded the victim's mental health evidence. The second was prosecutorial misconduct, based on the prosecutor making groundless objections, requesting (and being granted the right) to treat nine witnesses as hostile, and generally badgering witnesses. The third was that the jury instructions did not explain that to find defendant guilty of second-degree murder, the jury needed to find an absence of passion or provocation. The motion was denied. This appeal followed.

¶ 14. On appeal, defendant argues that even though his case was presented as a self-defense case, there were sufficient facts in evidence to merit an instruction on passion or provocation for the second-degree murder charge. He also argues that the exclusion of the victim's mental health evidence was error because it was clearly admissible under Rule 404(b). Finally, he argues that the dismissal of a juror partway through the trial because she admitted to having followed the story of the case during the grand jury phase was improper.

¶ 15. We begin with the question of the instruction. Defense counsel did not object to the jury instructions before the jury retired to deliberate, so defendant's objection is not preserved. See V.R.Cr.P. 30. Therefore, we review only for plain error. To find plain error, "(1) there must be an error; (2) the error must be obvious; (3) the error must affect substantial rights and result in prejudice to the defendant; and (4) we must correct the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *State v. Herrick*, 2011 VT 94, ¶ 18, 190 Vt. 292, 30 A.3d 1285.

¶ 16. The State charged defendant with two crimes, second-degree murder and aggravated assault with a deadly weapon.

---

[2] The jury found defendant not guilty of a second charge, aggravated assault with a deadly weapon.

With respect to the murder count, the court also instructed the jury on two uncharged, lesser-included offenses — voluntary manslaughter and involuntary manslaughter. The issue before us relates to the mental elements of these offenses and the transitional instruction. The second-degree-murder instruction required the jury to find that defendant acted with one of three alternative mental states: intent to kill, intent to do great bodily harm, or wanton disregard of the likelihood that death or great bodily harm would result. The court did not charge that the jury also had to find that defendant did not act under the influence of passion or provocation. The transitional instruction stated that the jury could consider the lesser-included offenses only if it decided that the State had not proven second-degree murder.

¶ 17. The instructions then moved on to the lesser-included offenses, starting with voluntary manslaughter. It defined that crime as "an intentional, unlawful killing of another human being committed under extenuating circumstances that would mitigate, but not justify the killing, such as great provocation that would cause a reasonable person to lose self-control." It went on to say that "[a] killing is voluntary manslaughter as opposed to murder if [defendant] was adequately provoked, did not have enough time to cool down and in fact did not cool down." This element was restated a number of times. For example, the instructions contained the same elements as second-degree murder, but added that voluntary manslaughter could be found "[e]ven if [defendant]'s mental state was influenced by extenuating circumstances, such as sudden passion or great provocation that would cause a reasonable person to lose self-control."

¶ 18. ■ Our relevant substantive law is clear: "Where passion or provocation is implicated, the court must instruct the jury that to establish murder the State must prove beyond a reasonable doubt that the accused did not kill under the influence of passion or provocation." *State v. Hatcher*, 167 Vt. 338, 345-46, 706 A.2d 429, 433 (1997).[3] Here, the instruction failed to include this element among its recitation of the elements of second-degree

---

[3] The Reporter's Notes for the Vermont Model Jury Instructions for Second Degree Murder explain that "lack of provocation" is not "an essential element that must always be proven in a prosecution for second degree murder," but "in a proper case involving substantial evidence of provocation, the lack of provocation becomes an essential element that the state will have to prove beyond a reasonable doubt." Available at http://vtjuryinstructions.org.

murder. Although it did come back to these elements in an instruction on voluntary manslaughter, this instruction came after the transition instruction that directed the jury to stop further deliberation if the elements of second-degree murder were established.

¶ 19. ■ A defendant is entitled to instructions that are " 'full, fair, and correct on all issues, theories, and claims' presented by the evidence." *State v. Swift*, 2004 VT 8A, ¶ 12, 176 Vt. 299, 844 A.2d 802 (quoting *State v. Day*, 150 Vt. 119, 123, 549 A.2d 1061, 1064 (1988)). We review jury instructions as a whole to ensure that they convey the spirit of the law and there is no fair ground to say that the jury was misled. *State v. Myers*, 2011 VT 43, ¶ 22, 190 Vt. 29, 26 A.3d 9. We cannot conclude that the instructions in this case were full, fair and correct on the elements of second-degree murder, assuming that the court's decision to charge voluntary manslaughter as a lesser-included offense was proper; nor can we conclude that the jury was not misled, despite the more accurate statement of the law in the voluntary manslaughter instruction.

¶ 20. We do not view the State as contesting this conclusion as far as it goes — the State does not argue that the instructions were erroneous if a provocation instruction was warranted. Instead, the State argues that (1) neither passion nor provocation is implicated in this case, and (2) even if it were, defendant was not prejudiced by the absence of that instruction because the defense foreclosed the possibility of a voluntary manslaughter conviction by presenting an "all-or-nothing" self-defense case. Based on this second argument, the trial court denied the motion for a new trial, stating that "provocation was never a factual issue, or a legal issue, argued by either of the parties at trial. This was a self-defense case."

¶ 21. ■ We begin with that second argument. The principle espoused by the State and the trial court — that a defendant is not prejudiced by flawed jury instructions that do not allow the jury to find an alternative outcome, implicated by the evidence but not argued — is incorrect, at least where there is preservation of an objection to the instruction. We explained this in *State v. Yoh*, 2006 VT 49A, 180 Vt. 317, 910 A.2d 853. In *Yoh*, we faced a situation in which passion or provocation was implicated by the evidence, *id.* ¶ 20, but a voluntary-manslaughter instruction was

not given to the jury at all. The defendant was convicted of first-degree murder and appealed, arguing that he was prejudiced by the absence of a voluntary-manslaughter instruction. We observed — much as the State and trial court did in this case — that the jury was faced with two entirely conflicting versions of the case, neither of which would have led to a voluntary manslaughter conviction. We found it "hard to believe that a jury presented with those two versions of events would have disregarded both arguments and settled on a verdict supported by evidence that both sides either ignored or dismissed." *Id.* ¶ 21. Even given that observation, however, we stated that "we would still reverse appellant's conviction if the jury had chosen to convict him of second-degree murder instead of first-degree murder." *Id.* ¶ 22. As the jury had convicted the defendant of the higher of the two offenses, though, we found that the absence of the voluntary manslaughter instruction was harmless beyond a reasonable doubt.[4] *Id.* ¶ 21.

¶ 22. ■ Applying the principle of *Yoh* to the case before us, we note the obvious point that the jury instructions in this case did include a voluntary-manslaughter instruction. However, the instructions overall were erroneous because they required the jury first to decide whether the State had proven the charge of second-degree murder before the jury could move on to consider the crime of voluntary manslaughter and the instructions on second-degree murder failed to include the absence of passion or provocation — even though the presence of such passion or provocation is the only distinction between the two crimes. As a result, the instructions effectively disallowed the jury from considering the lesser-included offense.[5] The logic of *Yoh* therefore

---

[4] We observed: "[P]resented with a choice between acquitting appellant, convicting him of second-degree murder, or convicting him of first-degree murder, the jury convicted appellant of first-degree murder. This verdict would likely have remained the same even if the court had charged the jury on voluntary manslaughter." *Id.* ¶ 23.

[5] In a case we have previously cited in *Hatcher*, 167 Vt. at 346, 706 A.2d at 434, the New Jersey court of appeals explained why the passion or provocation instruction is necessary for the murder charge even if voluntary manslaughter is given as a lesser-included offense:

> The reason for including the passion/provocation instruction within the initial charge on murder is because the absence of passion/provocation is an element of the murder charge which the State must prove beyond

applies full force to this situation: whether the absence of passion or provocation becomes an element of second-degree murder depends on whether there is evidence of passion or provocation, not on the arguments of the two parties to the jury. The fact that defendant relied upon the complete defense of self-defense, and not on the mitigating defense of provocation, does not mean that there was no instructional error.

¶ 23. Of course, in *Yoh*, the voluntary manslaughter instruction was requested, *id.* ¶ 19, whereas here the objection to the jury instructions was waived and we are reviewing only for plain error. However, presuming that the evidence did in fact support a passion or provocation instruction, which we conclude below that it did, the precedent of *Hatcher* allows us very comfortably to conclude that there was an error and that the error was obvious — the first two prongs of the test for plain error. We analyze the last two prongs of this test *infra* ¶¶ 29-32.

¶ 24. We turn now to the State's argument that there was no prejudice because the evidence, taken in the most favorable light to defendant, would not have allowed the jury to find "adequate provocation," because (1) the victim was reacting to a threat caused by the group including defendant advancing on him, and (2) "[d]amage to one's truck, although upsetting, does not mitigate murder."

¶ 25. We reject the first ground. The State exaggerates the nature of defendant's initial actions, particularly when the evidence is viewed in the light most favorable to him. While the evidence shows that the group of persons, including defendant, advanced towards the victim, and that there were loud and generally threatening words on both sides, there was no indication what would have occurred if they had reached him. None of the group seemed to have weapons at the time, and the victim had at least two weapons. Rather than acting defensively with those weapons, he acted offensively with the splitting maul in pursuing defendant.

¶ 26. The second ground assumes that the victim never tried to do anything beyond inflicting damage to defendant's truck. Wit-

---

a reasonable doubt. When the jury is not informed of such during the instructions on the purposeful or knowing murder, the sequential instructions permit the jury to convict a defendant of murder without any consideration of passion/provocation.

*State v. Bishop*, 589 A.2d 625, 629 (N.J. Super. Ct. App. Div. 1991).

nesses described more actions than that. For example, one witness, supported by another, testified that when defendant reached his truck, the victim was in close pursuit. The witness stated that defendant fell down when he reached the truck, but that action actually saved him because the victim would have hit him with the splitting maul if he had been standing: "It would have gone directly in his back." Another witness described the victim as advancing towards defendant prior to defendant shooting the victim in the leg: "like [the victim] would have hit [defendant] if he did not shoot him." Defendant's brother had found a rifle at this point and shot it into the ground to stop the victim from advancing on him. The atmosphere was chaotic: "And until the first shot, it was pandemonium, people running everywhere. Kids were crying, screaming. It was out of control." Many witnesses described being scared, including defendant in his statement.[6]

¶ 27. ▉ To establish provocation, the facts must show: "(1) adequate provocation; (2) inadequate time to regain self-control or 'cool off'; (3) actual provocation; and (4) actual failure to 'cool off.' " *State v. Kulzer*, 2009 VT 79, ¶ 25, 186 Vt. 264, 979 A.2d 1031 (quotation omitted). We have never specifically defined provocation. Definitions from other jurisdictions typically describe an action of provocation in terms of the reaction it is expected to induce. See *Varner v. Stovall*, 500 F.3d 491, 500 (6th Cir. 2007) (defining provocation under Michigan law to be an action that causes defendant to act out of passion rather than reason and that would cause a reasonable person to lose control); *People v. Fenenbock*, 54

---

[6] Defendant was interrogated by a state police officer on the day of the events. The interrogation was taped and played back to the jury. Defendant said that victim acted "[l]ike a madman" and was threatening to hit defendant with the axe and was swinging the axe. He said:

Everybody was scared. No one knew what to do. He was a madman, out of control. I was scared for my life, I was scared for my dog, scared for my brother, scared for my friends that were there. Didn't know what to do at that point. So I took the gun out.

He said further:

So at that point when he refused to not — not lay back and not come at me, I fired at him again because I was scared, you know? He was trying to cause harm to me, my truck, my dog that was in the back seat, my brother that was with me, and I had another friend that was with me, and I was scared, was scared for my life, scared for people around me.

Cal. Rptr. 2d 608, 617 (Ct. App. 1996) ("[P]rovocation may be anything which arouses great fear, anger or jealousy."); *State v. Melendez*, 643 P.2d 607, 608 (N.M. 1982) ("[P]rovocation can be any action, conduct or circumstances which arouse anger, rage, fear, sudden resentment, terror or other extreme emotions."); *State v. Starkey*, 244 S.E.2d 219, 225 n.7 (W. Va. 1978) (defining provocation as acts which would cause a reasonable person to kill and would cause a reasonable person to lose control and act out of heat of passion "and that he, in fact did so"). The State views self-defense and provocation as wholly separate concepts such that evidence that establishes one negates the other. Thus, in the State's view, defendant's testimony that he acted in self-defense negates a finding that he acted under provocation.

¶ 28. ■ In fact, provocation and self-defense are closely related; the common element in many cases is fear. Where a defendant claims self-defense and testifies that he acted out of fear, a jury verdict rejecting self-defense but finding the defendant guilty of voluntary manslaughter is reasonable and sustainable. See *Melendez*, 643 P.2d at 609. In this case there was ample evidence that defendant acted under provocation such as to sustain a verdict of voluntary manslaughter. The fact that the jury rejected defendant's claim of self-defense does not undermine this conclusion.

¶ 29. ■ This brings us to the heart of the issue — whether the instruction error rises to the level of plain error such that we must reverse the conviction. Plain error has four requirements. *Supra* ¶ 15. In addition, a claim of plain error in a jury instruction requires that "we examine the instructions in light of the record evidence as a whole and determine if any error would result in a miscarriage of justice." *Herrick*, 2011 VT 94, ¶ 18. Here, the first two elements of plain error are present: (1) there was error and (2) it was obvious. The second element is met because we clearly explained the requirements for second-degree murder in *Hatcher*. 167 Vt. at 345-46, 706 A.2d at 433. Thus, the issue turns on the third and fourth elements: (3) whether the error affected defendant's substantial rights and caused prejudice and (4) whether we must act because of the serious effect on the fairness of the proceeding. *Herrick*, 2011 VT 94, ¶ 18.

¶ 30. The State argues that these elements are not satisfied for essentially the same reason that it argued there was no error —

because defendant claimed he committed no crime as he engaged in self-defense. The State relies primarily on the rationale in *State v. Lambert*, a case in which the trial court failed to instruct the jury on an element of the charged offense, but there was no objection to the charge. 2003 VT 28, 175 Vt. 275, 830 A.2d 9. The offense was cruelty to a child, and the element was custody, charge or care of the child. We held that there was no plain error because "this element was not seriously at issue. Defendant did not contest that her son was in her care and custody at the time of the charged events . . . ." *Id.* ¶ 15. Without citing that case in this context, the State argues that the *Lambert* rationale exactly describes the situation here.

¶ 31. We disagree with the State's argument, and the disagreement is central to our conclusion that plain error is present in this case. Defendant had two possible responses to the State's case. One was a complete defense, self-defense; if the jury accepted this defense, defendant committed no crime. The second was that although defendant committed a crime, he did not commit murder as the State charged, but instead committed manslaughter. Defendant's position at trial was that he acted in self-defense and committed no crime. This does not mean, however, that if the jury rejected his self-defense theory he otherwise admitted to committing murder.

¶ 32. ■ Indeed, as discussed above, it would be entirely consistent for the jury to find that he acted under extreme provocation and did not commit murder despite his testimony that he acted in self-defense. The most likely rationale for the jury verdict was a finding that the victim was backing away from defendant after the first shot, not moving toward him, and therefore the second lethal shot was unnecessary to protect defendant from harm. A number of witnesses, including persons in the group that met the victim, testified that this occurred. While this finding might cause the jury to reject defendant's claim of self-defense, it would not determine whether the victim's actions were reasonably provoking. It was undisputed that the victim chased defendant with a splitting maul. Virtually all witnesses, including defendant, testified to the fear that the victim's actions engendered. Various witnesses testified to acts of extreme provocation. The critical events occurred in a very short period of time, with little opportunity for defendant to cool off. We upheld a verdict of voluntary manslaughter under similar circumstances in

a case where defendant relied upon self-defense. See *State v. Boglioli*, 2011 VT 60, ¶ 8, 190 Vt. 542, 26 A.3d 44 (mem.). There is a substantial likelihood that the jury would have found that defendant acted under the influence of provocation and rendered a similar verdict here, but the jury instructions prevented a verdict based on that finding.

¶ 33. In these circumstances, the elimination of the opportunity for the jury to find voluntary manslaughter, and not murder, was prejudicial to defendant. We conclude that the jury instruction caused a miscarriage of justice that affected the fairness of the trial. We cannot uphold the resulting verdict, even though defendant did not object to the jury instruction.

¶ 34. Defendant's second claim on appeal is that the trial court erred in excluding the mental-health-related evidence from the victim's health-care provider that was obtained by subpoena. We address this issue because it is very likely to arise on remand.

¶ 35. We purposely address this issue in a summary fashion because the evidence in question was sealed by the trial court, and we are giving guidance for remand rather than ruling on whether the trial court's evidentiary decisions were correct.[7] We emphasize that the ground for sealing, namely the patient's privilege, and the basis for exclusion of the evidence were totally different. The sealing decisions did not actually determine that public disclosure of the medical records and depositions would violate the patient's privilege. Neither party has asked us to review the sealing decision. Moreover, evidentiary rulings are

---

[7] In this posture, we also do not address the State's argument that some of defendant's arguments were not preserved regarding the admissibility of information in the records. Unsurprisingly, defendant's arguments became more focused and refined when presented on appeal. Since we are remanding, however, defendant can again present his arguments in the trial court and will likely present them as he has on appeal. Therefore, it is irrelevant whether he stated them fully for the first trial.

We add the observation that defendant's defenses were limited by the broad pretrial ruling of the trial court. For example, defendant argues here that the victim may have been suicidal and that condition explained his conduct towards defendant. That argument, to the extent that it could have been made, was foreclosed by the exclusion of the medical evidence. In this way, the situation was like that in *State v. Memoli*, in which we stated: "It is wholly inconsistent to on the one hand require defense attorneys to abide by broad pretrial orders or risk sanctions, and on the other hand punish defendant for not raising a defense that was wholly dependent on the evidence that was excluded." 2011 VT 15, ¶ 15, 189 Vt. 237, 18 A.3d 567.

discretionary, but the court's sealing decision does not specify how its discretion was exercised. In these circumstances, we choose to abide by the sealing decision and not describe the evidence in any detail in this decision. We conclude that we can give adequate guidance to the trial court on remand within this limitation.

¶ 36. The State's motion in limine made three basic arguments: (1) the evidence should be excluded under the patient's privilege; (2) the evidence sought to show the victim's violent character, but because defendant was unaware of the information in the records at the time of the killing, the evidence was excluded by Rule 404(b) as evidence that he "acted in conformity" with his character; and (3) any probative value to the evidence would be substantially outweighed by the danger of unfair prejudice to the prosecution or confusion of the issues, rendering it inadmissible under Rule 403.

¶ 37. In brief, defendant's response was that the evidence was relevant to his self-defense claim because it explained the victim's actions at the ball field and why the victim would have continued to charge towards defendant before the second shot. Defendant argued that the evidence was not prohibited under Rule 404(b) because it was being offered for noncharacter purposes and did not show "other crimes, wrongs or acts." He argued that the evidence was highly probative and not excludable under Rule 403. Finally, he asserted a number of reasons why the patient's privilege was not a barrier to admissibility.

¶ 38. The court granted the motion in limine and excluded all the evidence,[8] but did not reach the State's privilege argument or defendant's responses that the privilege did not apply to the evidence and that the evidence was admissible because of defendant's constitutional right to present his case. Essentially, the court perceived defendant as seeking to admit evidence of "the victim's motive at the time of the shooting." The court found the victim's motive to be irrelevant unless defendant actually knew of the facts shown by the evidence at the time of the shooting, and the court found that defendant did not know of these facts. It also held that "[i]n order for evidence of a victim's motive to be admissible in the form of specific instances of conduct, . . . the motive must be

---

[8] Although the record indicates that defense counsel took depositions of individual mental health care providers, the record does not contain the depositions, and the court did not reference deposition statements in its decision. Thus, our discussion relates solely to the records obtained by subpoena.

an essential element of the offense" under Rule 405, which it was not. The court went on to hold that even if the evidence were admissible under Rules 404 and 405, the court would hold it inadmissible under Rule 403 because its probative value was substantially outweighed "by the danger of confusion of the issues, misleading of the jury, and waste of time." The court acknowledged that it was issuing a broad pretrial evidentiary ruling but opined that "there was a clear advantage to deciding the issue now, with the benefit of reflection and briefing, rather than during opening statements, where the issue otherwise would have inevitably arisen."

¶ 39. ▮▮▮ Generally, we review evidentiary rulings for abuse of discretion. *Quirion v. Forcier*, 161 Vt. 15, 21, 632 A.2d 365, 369 (1993). This includes rulings for exclusion of a victim's prior acts. *State v. Ovitt*, 2005 VT 74, ¶ 11, 178 Vt. 605, 878 A.2d 314 (mem.). We must also bear in mind, however, that in criminal cases "the broad discretion of the trial court in evidentiary matters is limited by defendant's constitutional right to confront witnesses against him and by the demands of due process." *State v. Webster*, 165 Vt. 54, 56, 675 A.2d 1330, 1332 (1996).

¶ 40. ▮▮▮ The evidentiary issue arises in relation to defendant's claim that he acted in self-defense. Self-defense in the context of a homicide prosecution is defined in 13 V.S.A. § 2305(1) as a circumstance that renders guiltless a person who kills or wounds another "[i]n the just and necessary defense of his or her own life" or the lives of certain others. We clarified the "just and necessary defense" requirement in *State v. Wheelock*, 158 Vt. 302, 307, 609 A.2d 972, 975 (1992), explaining that self-defense is just and necessary when the "defendant's belief of imminent peril and of the need to repel that peril with deadly force is reasonable." The jury "must assess the reasonableness of a defendant's apprehension, taking into account not only the circumstances with which he is confronted, but his individual attributes as well." *Id.*

¶ 41. ▮▮▮ We start with the trial court's reasoning in issuing a broad decision in limine. As the court noted, we have cautioned against broad pretrial evidentiary rulings. In *State v. Williams*, 2010 VT 77, ¶ 11, 188 Vt. 405, 9 A.3d 315, we took "the opportunity to point out the pitfalls in granting such broad pretrial motions, and to underscore the advantages of either deferring a ruling until trial or, at a minimum, establishing a clear

basis for deciding the issue in advance." In *State v. DuBois*, we noted that an in limine ruling should be used " 'as a rifle and not as a shotgun.' " 150 Vt. 600, 602, 556 A.2d 86, 87 (1988) (quoting *Lewis v. Buena Vista Mut. Ins. Ass'n*, 183 N.W.2d 198, 201 (Iowa 1971)). We recognize that the court here believed that allowing the evidentiary issues to linger would have disrupted the trial and that it believed it had a clear basis to decide the issue in advance. We also recognize that the records all came from one source and were before the court. Nevertheless, we conclude, as we discuss below, that the records present a number of difficult evidentiary issues that the trial court did not fully address. Because of the range of evidentiary issues implicated by the motion in limine, the trial court ought to have analyzed the many various classes of evidence before it, providing a specific rationale for admitting, excluding, or deferring ruling on each item at issue. At least on some of the issues, the admissibility decision was better left to the trial.[9]

¶ 42. We turn to the court's specific grounds for excluding the medical records, beginning with the court's ruling that the information in the records was irrelevant based on its characterization that defendant sought to show the victim's motive. As stated above, defendant's main relevancy point was that the information in the records would support his position that the victim kept advancing on him, holding the splitting maul, even after the first shot. He argues that the information goes to the victim's mental state at the time of the events and explains why the victim would not desist from the attack. He further argues that, based on the records, the jury could find that the victim was attempting a form of suicide.

¶ 43. ██ Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." V.R.E. 401. If the excluded evidence would make it more probable to the jury that the victim was an aggressor when he was shot, it is relevant. Relevant

---

[9] One evidentiary issue that is missing from the trial court's analysis because of the in limine ruling is whether defendant could maintain his theory on the significance of the medical records without expert testimony. Defense counsel never indicated that he would employ an expert witness for this purpose, and the trial court never determined whether an expert witness would be required.

evidence assists the jury in determining the "circumstances with which [defendant] is confronted." *Wheelock*, 158 Vt. at 307, 609 A.2d at 976.

¶ 44. ■ Relevancy in this case is clear from the way the rules of evidence handle character evidence. Although we conclude, *infra*, that at least some of the evidence in question is not character evidence, the relevancy question is the same regardless. Evidence of a pertinent trait of the victim's character is admissible in a criminal case under Rule 404(a)(2), although the method of proof is restricted by Rule 405(a). This is an exception to the general prohibition against admitting evidence of a character trait to show that the person "act[ed] in conformity therewith." V.R.E. 404(a). The typical evidence admitted under Rule 404(a)(2) is evidence that the victim has a character trait for engaging in violent behavior. See *State v. Roy*, 151 Vt. 17, 30, 557 A.2d 884, 892 (1989), *overruled on other grounds by State v. Brillon*, 2008 VT 35, ¶ 14, 183 Vt. 475, 955 A.2d 1108; see also *People v. Orlewicz*, 809 N.W.2d 194, 202 (Mich. Ct. App. 2011) ("Evidence concerning the aggressive character of a homicide victim, even if the defendant was unaware of it at the time, is admissible in furtherance of a self-defense claim to prove that the victim was the probable aggressor."). As reflected in the rule's further authorization allowing the prosecution to introduce evidence of the victim's character trait of peacefulness "to rebut evidence that the victim was the first aggressor," the understanding of relevancy is exactly the same as that advocated by defendant here. V.R.E. 404(a)(2). The logical thread is, based on propensity, the probability that a person with a violent character acted in conformity therewith in the altercation that resulted in the victim's death.

¶ 45. ■ The trial court in this case appeared to conclude that evidence of the victim's mental state was admissible *only* if defendant knew of this evidence at the time of the killing. This ruling is contrary to our holding in *State v. Roy*, 151 Vt. at 30, 557 A.2d at 892. *Roy* held that, in an assault-on-a-police-officer prosecution, evidence of the officer's reputation for using excessive force is admissible to show whether defendant's resistance to arrest was justified even though defendant was unaware of that reputation. *Roy* is consistent with the overwhelming majority of decisions around the country. See *Commonwealth v. Adjutant*, 824 N.E.2d 1, 6-7 (Mass. 2005) (surveying cases from federal courts

and every state in the country and revealing that every federal court and courts in forty-five of forty-eight states to consider the question mirror the holding of *Roy*).

¶ 46. Nevertheless, the State argues that the trial court's holding is required by our recent memorandum decision in *State v. Boglioli*, 2011 VT 60, ¶ 22, also a homicide self-defense claim case, where we noted that evidence of a prior threat by the victim, made to a third person, could not be relevant to defendant's state of mind because defendant did not know of the threat at the time of the shooting. We added that even if it were probative of the victim's state of mind, "the victim's state of mind is immaterial to the question of self-defense." *Id.*

¶ 47. ▮▮ We acknowledge that this language is overbroad, confuses the issue as it is presented here and appears inconsistent with *Roy*, a decision that it did not cite. The discussion in *Boglioli* indicates that the Court was concerned with the defendant's state of mind and was holding that the victim's threats of violence, unknown to the defendant, were irrelevant to the defendant's state of mind. See *Boglioli*, 2011 VT 60, ¶ 22. To the extent that the language of *Boglioli* is inconsistent with the holding in *Roy*, we overrule it.

¶ 48. ▮▮ In this case, the victim's conduct at the ball field, and particularly in the last minutes before the killing, is relevant to defendant's self-defense claim. If the victim's state of mind is, in turn, relevant to the victim's conduct, irrespective of whether that state of mind is known to defendant, it meets the relevancy requirement of Rule 401. The way the evidence rules handle character shows that state of mind can be relevant to the victim's conduct.

¶ 49. Some of the confusion in this case resulted from labeling defendant's theory as trying to establish the victim's motives for his actions. We conclude that the word was misused in this context. If the medical records, for example, contained evidence that defendant had engaged in misconduct with respect to the victim's girlfriend, we might describe that evidence as establishing a motive for the victim pursuing defendant with a splitting maul. Nothing like that is in the medical evidence. Instead, it relates generally to the victim's mental health condition at the time of the killing, a circumstance that we would not describe in this case as motive.

¶ 50. Based on our review of the excluded evidence, we conclude that in general it is relevant to defendant's self-defense theory for the reason that defendant argued.

¶ 51. The more difficult questions arise with respect to how defendant might introduce the relevant evidence. The State argues, and the trial court apparently accepted, that the medical records contain character evidence and its use would be based on propensity reasoning. As we described above, our rules contain a general prohibition on using character evidence "for the purposes of proving action in conformity therewith on a particular occasion," V.R.E. 404(a), but there is an exception for "evidence of a pertinent trait of character of the victim of the crime offered by an accused." *Id.* 404(a)(2). There are two relevant provisos to the exception. First, under Rule 405(a), where evidence of a character trait is admissible, "proof may be made by testimony as to reputation." Introduction of evidence of specific instances of conduct is allowed only on cross-examination. *Id.* Second, under Rule 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith," but may be admissible for other purposes. Although the trial court was less explicit on these points, we read its decision as concluding that *all* of the evidence of specific instances of conduct in the medical records sought to be admitted was character evidence improperly offered to show that the victim acted in conformity with his character trait.

¶ 52. The information in the records includes actions of the victim, communications with medical care providers, communications from medical care providers, and diagnoses and treatment. Some of the information involves medical history. Although Rule 404 uses the term "character," it does not define it. In general, a medical condition, including a mental health condition, has not been viewed as a character trait for purposes of the evidence rules:

> A more difficult question of definition is presented by proof of mental characteristics. Insanity is not usually thought of as a question of "character" and Wigmore argues that other evidence of mental infirmity is admissible to prove conduct. While mental condition must be proved indirectly like character, weakness of mind does

not usually have the prejudicial impact of a moral judgment.

22 C. Wright & K. Graham, Federal Practice and Procedure: Evidence § 5233, at 355 (1978); see *State v. Hendricks*, 173 Vt. 132, 144, 787 A.2d 1270, 1279 (2001) (Dooley, J., concurring) ("Rule 404(a) restricts character evidence and not propensity evidence."); B. Anderson, *Recognizing Character: A New Perspective on Character Evidence*, 121 Yale L.J. 1912, 1927 (2012) ("Propensity reasoning is also the foundation for the logical relevance of other types of proof that courts have recognized are not character evidence. Proof of . . . mental conditions and illnesses . . . depend[s] on propensity inferences. Therefore, propensity should not be seen as synonymous with character, but instead as one component of it and the basis of its logical relevance."). The reasoning of the Wright and Graham treatise was applied in *Bell v. Whitten*, 722 So. 2d 1057 (La. Ct. App. 1998),[10] a case in which a deputy sheriff was injured during the arrest of a belligerent underage minor who was under the influence of alcohol. The deputy sheriff sued the minor who caused his injuries and the minor's father, as well as another underage minor who had supplied the alcohol at a house party and his mother. The defendants obtained the medical records of the minor who injured the sheriff to show he had been diagnosed with "intermittent explosive disorder" and "conduct disorder, solitary aggressive" and that his actions were caused by his mental condition and not his consumption of alcohol. The court held that the records were admissible because a mental condition is not a character trait and, therefore, Louisiana's equivalent of Rule 404(a) did not apply. *Id.* at 1061.

¶ 53. The New Mexico Supreme Court used a similar analysis in *State v. Stanley*, 37 P.3d 85 (N.M. 2001). In *Stanley*, a defendant charged with homicide attempted to introduce medical records of the alleged victim to show the victim was suicidal and had attempted on a number of occasions to commit suicide, in support of the claim that the victim's death was caused by his suicide and not defendant's homicide. The court rejected the argument that evidence that the victim was suicidal was inadmissible because it showed the victim's character:

---

[10] *Bell* is discussed in Anderson, *supra*, at 1960-61.

The evidence of prior suicide attempts is not appropriately analogized to prior bad acts which are inadmissible to show character, as provided for under Rule [404(b)]. Rather, the evidence here was of a serious, long-term mental illness treatable with medication and specific manifestations of that illness.

We hold that evidence of suicidal tendencies of a deceased should not be considered character evidence for purposes of Rule [404(b)]. Suicidal dispositions typically stem from mental illness, not from a person's "bad character" or trait of character.

*Id.* at 92 (footnote omitted).

¶ 54. ▉ To the extent that the "character trait" evidence the trial court relied upon here is actually evidence of a diagnosed mental condition, for which the victim was receiving medical treatment, we hold that Rules 404 and 405 do not govern admissibility. Of course, as discussed *infra*, the evidence must meet the requirements of Rule 403.

¶ 55. ▉ There is a second reason why Rule 404(a) does not apply to some of the medical evidence — it involves communications and not acts. In *State v. Crannell* we considered the admissibility of a statement the defendant made in a letter to his wife stating that his greed might have taken him down the path of a professional hit man: "I was on my way." 170 Vt. 387, 400-01, 750 A.2d 1002, 1014 (2000), *overruled on other grounds by Brillon*, 2008 VT 35, ¶ 42. The defense sought to exclude the statement under Rule 404(b) as a bad "act." We responded, citing numerous precedents from other jurisdictions, that "[t]he statement at issue is not an 'act' within the usual meaning of Rule 404; it is merely a statement defendant wrote" and "[t]he statement does not reveal any prior misconduct such as Rule 404 forbids." *Id.* Some of the medical evidence here, including evidence defendant most seeks to admit, fits within the *Crannell* rationale.

¶ 56. ▉ Third, some of the medical evidence defendant sought to admit here relates to prescribed medications and the reasons for those prescriptions. Evidence of the drugs that were in the victim's system at the time of his death — some of which were medications — was admitted. Numerous decisions have ruled that evidence of a victim's drug use at the timing of the killing is

admissible in cases where the defendant alleges self-defense and the circumstances of the death are contested. *State v. Baker*, 623 N.E.2d 672, 677 (Ohio Ct. App. 1993); *Jones v. State*, 201 P.3d 869, 881-82 (Okla. Crim. App. 2009); *State v. Ventre*, 811 A.2d 1178, 1185 (R.I. 2002) (holding that evidence of a victim's intoxication should have been admitted to establish that the victim "may well have been disinhibited by intoxication and more likely to have engaged in aggressive conduct toward defendant"). If the presence of drugs in the victim's system is admitted, evidence of how the presence or absence of those drugs affected the victim's conduct may also be admissible. Some of the evidence defendant wanted to admit falls in this category.

¶ 57. Finally, we address the court's decision with respect to Rule 403, which provides that the trial court may exclude relevant evidence if it finds that the "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." We have described Rule 403 rulings as highly discretionary and the standard of review as very deferential. See *State v. Lee*, 2005 VT 99, ¶ 11, 178 Vt. 420, 886 A.2d 378. The trial court ruled that even if it found the medical record evidence to be relevant, it would exclude the evidence under Rule 403 for three reasons: (1) certain of the victim's actions as described in the records would "present a significant danger of confusion and waste of time because they would involve separate mini-trials as to whether the incidents actually occurred in the manner portrayed by defendant"; (2) there would be conflict about the victim's interaction with medical providers; and (3) all of the medical evidence "is misleading to the extent that it suggests that the trial is about [the victim's] mental state. It is not." The third reason is really a restatement of the court's ruling that the evidence is irrelevant, a ruling we found erroneous above. The first and second reasons are demonstrations of why a broad pretrial evidentiary ruling was fraught with difficulty in this case. Neither reason fully addresses all the evidence. The trial court had no information that mini-trials about events and statements disclosed in the medical records would, in fact, have occurred. Indeed, the State had not suggested that it would attempt to keep out the medical evidence based on its accuracy; instead, its argument was that it was primarily character evidence excluded by Rules 404(b)

and 405, an argument largely unexplored by the trial court. Certainly, a more complete record could have narrowed the issues and allowed an informed understanding of what would be presented and opposed at trial.

¶ 58. Having said the above, we recognize that there were important Rule 403 concerns about the evidence. However the jury evaluated the evidence, it was clear that the victim was acting irrationally and out of control by chasing a person he had never met before while swinging a splitting maul, a very dangerous weapon. The medical evidence may have better explained the behavior of the victim, but many aspects of that behavior were undisputed in the admitted evidence. There are limitations to the probative value of the evidence.

¶ 59. Moreover, although we have ruled above that mental health evidence may provide a noncharacter explanation for the victim's mental state and behavior, it would be important for the trial court to determine whether it provided such an explanation in this case. At best the line between a character trait and mental illness is blurry in many instances. As the Wright and Graham treatise elaborates, it would be anomalous to exclude evidence that a defendant has a reputation as a thief, but then to allow evidence that defendant is suffering from a mental illness that causes kleptomania. 22 Wright & Graham, *supra*, § 5233, at 355.

¶ 60. Again, we stress that it is difficult to make a Rule 403 decision covering all of the evidence in the record with one rationale. Given the complexity of the decision, it may be more efficient to reach a decision on the State's patient's privilege claim before addressing whether items of evidence are admissible under Rules 403 and 404(a), an approach the trial court did not employ before the first trial. It would also be helpful for the court to know whether inferences from the medical records will be drawn through expert testimony and to identify the actual disputes between the parties on the medical records' significance.

¶ 61. Because we reverse and remand, we do not reach the question of the dismissal of the juror. The circumstance is unlikely to reoccur on remand.

*Reversed and remanded for a new trial.*