NOTICE:  This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports.  Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2018 VT 28

No. 2016-284

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Washington Unit, |
| | Criminal Division |
| | |
| Nathaniel R. Peatman | October Term, 2017 |

Kevin W. Griffin, J.

James Pepper, Deputy State's Attorney, Montpelier, for Plaintiff-Appellee.

Allison N. Fulcher of Martin & Associates, Barre, for Defendant-Appellant.

PRESENT:  Reiber, C.J., Skoglund, Robinson, Eaton and Carroll, JJ.

¶ 1.  **SKOGLUND, J.**   Defendant Nathaniel Peatman appeals his convictions, following a jury trial, for first-degree aggravated domestic assault, aggravated assault of a law enforcement officer, and resisting arrest.  Defendant argues that his convictions must be reversed because the jury instructions failed to guarantee unanimous verdicts.  We affirm.

¶ 2.  On December 30, 2014, defendant was arrested and charged with first-degree aggravated domestic assault, aggravated assault of a law enforcement officer, resisting arrest, and impeding a public officer following a series of events involving defendant's girlfriend (girlfriend), her son, and the responding officers.

¶ 3.  Prior to trial, defendant gave notice of his intent to present a diminished capacity defense for the specific-intent charges—most importantly for this appeal, for the willful conduct

element under the first-degree aggravated domestic assault charge. Additionally, the State gave notice of election of the elements to be tried as follows: the first-degree aggravated domestic assault charge would proceed under both willful and reckless conduct; the aggravated assault on a law enforcement officer charge would proceed under both attempted to cause and caused serious bodily injury. Defendant objected to the State's election and sought to have the State choose one theory for each charge prior to closing argument. At the jury draw, a subsequent motion hearing, and on the morning of trial, defendant expressed concerns about crafting jury instructions that would guarantee a unanimous verdict. The trial court disagreed, and allowed the State to proceed with their alternate theories of the case.

¶ 4. A one-day jury trial took place on February 1, 2016. The State presented the following evidence through five witnesses. Girlfriend testified that, on the night of the incident, defendant was at her apartment playing videogames with her son. Throughout the night, defendant was drinking homebrew* and getting progressively more critical about the cleanliness of girlfriend's apartment, to the point that he began berating girlfriend with insults such as "filthy pig" and "hog." Girlfriend put her son to bed in another room and asked defendant to leave. When defendant refused, girlfriend got up to go to another room in the apartment, but defendant grabbed her arm and pushed her back up against a bookcase. Defendant "knock[ed her] around the head" with a closed fist. While defendant was hitting girlfriend, her son came out of his room and screamed at defendant to stop.

¶ 5. At this point in time, girlfriend's upstairs neighbor testified that she heard "scream crying" and a male voice yelling "Cut the F'ing shit." The neighbor became concerned, went down to girlfriend's apartment, and knocked on the door. Defendant opened the door and told the neighbor that everything was fine. The neighbor testified that defendant smelled of alcohol and

---

* Defendant testified to drinking two to two-and-a-half glasses of "homebrew." The alcohol content of the beverage was not established at trial.

was slurring his words. Although defendant was standing in the doorway, the neighbor could see that girlfriend and her son were crying in the apartment and that girlfriend's nose was bleeding. The neighbor walked past defendant into the apartment and asked girlfriend and her son if they were okay. Girlfriend's son eventually responded that defendant had beat girlfriend. When the neighbor left to call the police, defendant started hitting girlfriend again, "full fisted" in her right eye, knocking her head against the wall.

¶ 6. The neighbor and her fiancé waited outside for the police. When the first responding officer, Officer Karie Tucker, arrived, the neighbor told her that defendant was "in a drunken rage." Officer Tucker testified that, as she approached girlfriend's apartment, she heard yelling. Within seconds of her arrival at the apartment, defendant opened the door and Officer Tucker could see girlfriend, with a bruised and swollen eye, and her son in the apartment. Defendant tried to walk past Officer Tucker, but she grabbed him by the arm and attempted to handcuff him. Defendant responded by immediately grabbing Officer Tucker's throat with both hands, choking her. With her free hand, Officer Tucker attempted to push defendant's face away, but he bit her middle finger. Officer Tucker then struck defendant's face with the hand she was holding the handcuffs in and hit him in the groin until defendant released her, at which time Officer Tucker was able to handcuff one of defendant's hands.

¶ 7. The neighbor's fiancé entered the hallway where Officer Tucker and defendant were engaged in the struggle. Officer Tucker threatened to use her taser on defendant if he did not comply, at which point defendant struck the taser out of her hand and punched her in the face several more times. The neighbor testified that when she entered the hallway, she saw her fiancé restraining defendant and blood streaming from Officer Tucker's face. Two additional officers then arrived on the scene. They were able to handcuff, arrest, and transport defendant to the police station to be booked. The entire altercation between defendant and Officer Tucker lasted less than six minutes.

¶ 8.    At the close of the State's case, defendant moved for judgment of acquittal for the charges of first-degree aggravated domestic assault, aggravated assault of a law enforcement officer, and resisting arrest.  Defendant argued first that his diminished capacity negated any willful conduct, and second that there was insufficient evidence that this was a lawful arrest and that defendant knew Officer Tucker was a law enforcement officer.  The court denied defendant's motions, finding sufficient evidence that defendant's actions were willful and that, while there was evidence that defendant had been drinking, the evidence did not suggest that he was intoxicated beyond the point of being capable of acting willfully.  Further, the court found there was enough evidence to show that Officer Tucker's injuries could also have been caused by reckless behavior and that she was a law enforcement officer performing a lawful duty.

¶ 9.    Defendant then took the stand in his own defense.  He testified that he had been drinking homebrew at girlfriend's apartment and that he was intoxicated.  Defendant did not remember what triggered it, but he testified that he "snapped" and started "flicking" girlfriend in the back of the head.  After he answered the door and told the neighbor that everything was fine, girlfriend said something that caused defendant to "flick" her again, which he conceded was the source of girlfriend's bruised eye.  Defendant briefly talked to girlfriend's son, then exited the apartment where he encountered Officer Tucker.  He testified that, even though she was wearing a police uniform, he believed she may have been an adult entertainer in costume, and thus, when she asked him to face the wall, tried to put handcuffs on him, and started hitting him, he defended himself.  Defendant said he never hit Officer Tucker, but merely grabbed her arms to protect himself and block her blows.  When the two additional officers arrived, defendant testified that he went to them to have them stop Officer Tucker's assault, but the other officers started beating him and knocked him unconscious.  Defendant testified that, when he woke up, he was lying on his back in the middle of the driveway in front of a police cruiser.

¶ 10.    After the close of evidence and closing arguments, defendant again raised his concerns that the State's alternative theories might leave open the possibility that the jury could not be unanimous on any one theory and that the jury might not know how to properly consider the diminished capacity defense.  As to the alternate theories, the trial court determined that it could craft an instruction that could sufficiently define "willful" and "reckless" and make it clear to the jury that they must be unanimous.  The trial court explained that "whether the jury believes it is reckless, or whether there are some who get to the higher state of willful, they will have necessarily gone from reckless to willful," which ensures unanimity.  As to defendant's concern that the jury might not properly consider the diminished capacity defense, the trial court determined that it was unnecessary to repeat the entire instruction for diminished capacity after each charge where the defense applied because the jury had copies of the instructions in the jury room and could easily refer to the diminished capacity instruction.  Therefore, the court decided it would read the instruction in its entirety once, but after reading the individual elements of each charge, the court would instruct the jury for which intent elements they should consider for diminished capacity.  Further, defendant did not object to the lack of a jury instruction requiring unanimity on the specific acts establishing the aggravated assault of a law enforcement officer or the resisting arrest charges.

¶ 11.    The court instructed the jury and sent them into deliberation.  While deliberating, the jury sent out a note asking whether they had "to agree on the specific physical acts listed" or if they could "be sure beyond a reasonable doubt that he 'caused serious bodily injury' or 'attempted to prevent a lawful arrest' regardless which [of] those physical acts were carried out."  In other words, were they "limited to those physical acts."  The trial court determined that because all the acts happened during a very short period of time, the jury did not have to agree "that it was three strikes versus two, or choking versus this, this."  Defendant objected to this determination.  The trial court then instructed the jury the following:

5

[Y]ou don't all have to agree on the specific acts that, for example, I cited in the instructions. Your duty is to use your recollection of the evidence. So you're not limited to those acts. There could be more or there could be less. . . . But you must unanimously agree that the particular element was established beyond a reasonable doubt.

¶ 12. The jury convicted defendant on all four counts. The verdict form indicated that on the charge of aggravated assault on a law enforcement officer, the jury found defendant guilty on the theory of attempting to cause serious bodily injury, and therefore did not reach a verdict on the State's alternative theory of causing serious bodily injury. This appeal followed.

¶ 13. On appeal, defendant argues that the jury instructions did not guarantee juror unanimity in violation of the Vermont Constitution. Vt. Const. ch. I, art. 10 (assuring that person cannot be found guilty without unanimous consent of jury). First, for the first-degree aggravated domestic assault conviction, defendant argues that the instructions failed to ensure unanimity on which of the requisite mental states—willful or reckless—the jury found to establish guilt. Second, for the aggravated assault of a police officer and resisting arrest convictions, defendant argues that the instructions were erroneous because the jurors were told they were not required to agree on which act or acts they found established the requisite element.

¶ 14. The "party appealing [the] jury charge has the burden of establishing that the charge was both erroneous and prejudicial." Mobbs v. Cent. Vt. Ry., 155 Vt. 210, 218, 583 A.3d 566, 571 (1990). When reviewing jury instructions, this Court must "read the charge as a whole, rather than piecemeal, and will uphold the instruction where it breathes the true spirit and doctrine of the law and does not mislead the jury." State v. Pitts, 174 Vt. 21, 23, 800 A.2d 481, 483 (2003) (quotation omitted). However, a trial court "is not required to make every comment that conceivably could be made on the issues and evidence" and "[t]he degree to which the court is to elaborate on the points charged lies within the sound exercise of its discretion." Currier v. Letourneau, 135 Vt. 196, 204, 373 A.2d 521, 527 (1977).

6

¶ 15.    Defendant first argues that the trial court's instructions erroneously did not require the jury to be unanimous on the mental state element—willful or reckless—for defendant's first-degree aggravated domestic assault conviction.  The trial court relied on this Court's previous analysis of ascending mental states when instructing the jury.  State v. Bolio, 159 Vt. 250, 617 A.2d 885 (1992); State v. Boglioli, 2011 VT 60, 190 Vt. 542, 26 A.3d 44 overruled on other grounds by State v. Bolaski, 2014 VT 36, ¶ 47, 196 Vt. 277, 95 A.3d 460.  In Bolio, this Court held that willful conduct involves a degree of intent that is greater than reckless conduct.  159 Vt. at 253, 617 A.2d at 887 ("To 'purposely or knowingly' cause harm is to form a degree of intent to harm that is greater than to 'consciously disregard' the risk that harm may result from the conduct.").  The Court applied this principle in Boglioli when it affirmed a conviction for voluntary manslaughter, even though the jury instructions did not require the jurors to choose and unanimously agree upon one of the three possible mental states that could be used as a basis to support the conviction: intent to kill, intent to do great bodily harm, and wanton disregard of the likelihood of death or great bodily harm.  2011 VT 60, ¶ 11.  It noted that the element required to sustain a conviction was that a defendant have "intent," and the three mental states were merely alternative ways to demonstrate that the defendant had the requisite intent.  Id. ¶ 12.  Therefore, it concluded that "[a]s long as all jurors were unanimous on the ultimate issue of intent, which of the three alternative methods used to inform each decision as to intent is immaterial."  Id.

¶ 16.    While defendant concedes that Bolio and Boglioli are still good law, he opines that they are inapplicable in the present case because the jury was also given the added consideration of a diminished capacity defense.  Defendant contends that the jury should have been instructed to first consider willful intent and the defense of diminished capacity and, if they were unanimous that defendant's diminished capacity left him unable to form willful intent, they would be required to return verdict of not guilty and would not be permitted to consider recklessness.  Essentially, defendant argues that in the manner the jury was instructed, a juror or some of the jurors could

7

have accepted the diminished capacity defense and determined that defendant could not have acted willfully, but then wrongfully considered whether he acted recklessly. This argument is flawed.

¶ 17. The first-degree aggravated domestic assault statute states that a person commits the crime if they "willfully or recklessly" cause the required injury. 13 V.S.A. § 1043(a)(1) (emphasis added). When this Court construes a criminal statute, "we presume that the Legislature knows how to incorporate a scienter element." State v. Richland, 2015 VT 126, ¶ 8, 200 Vt. 401, 132 A.3d 702. Thus, we must assume that the Legislature expressly intended to include recklessness as an alternative intent level to willfulness—if one was not satisfied, the other should be considered. The fact that a defense is applicable to only one of those intent levels does not change the availability of the other as an alternative. To adopt defendant's contention that the jury was precluded from considering recklessness if it could not find willful intent, this Court would have to disregard the statute and essentially eliminate the reckless theory from the offense.

¶ 18. Here, the trial court's instruction on first-degree aggravated assault tracked the language of the statute and contained definitions for both mental states. It gave the jury the diminished capacity instruction requested by defendant and explicitly instructed them to consider whether defendant's intoxication negated his ability to form willful intent. Additionally, jury was instructed that if it "ha[s] a reasonable doubt about whether [defendant] was capable of forming the required intent, or whether he actually formed the required intent, you must . . . find him not guilty." Therefore, we find that the instructions, taken as a whole, reflect the spirit of the law and the jury was not misled. Further, we hold that, because the instructions were clear that the jury was only to consider diminished capacity with willful intent and because there is nothing restricting recklessness to be considered in the alternative, Bolio and Boglioli apply and thus the jury was necessarily unanimous on the intent element of defendant's first-degree aggravated domestic assault conviction.

8

¶ 19.     Defendant next argues that the trial court erred because the jury instructions did not guarantee juror unanimity on the aggravated assault of a law enforcement officer and resisting arrest convictions because the jurors were told they were not required to agree on which act, or acts, they found established the requisite element.  He argues that the lack of an instruction and the State's failure to make an election as to the specific act or acts that constituted the offenses charged is an error that satisfies the high bar set by the plain error analysis.  Notwithstanding defendant's apparent request for plain error review, we find that the objection was preserved for full appellate review.  Under the correct standard of review, we find no error.

¶ 20.     In instructing the jury on the aggravated assault of a law enforcement officer charge, the court listed several acts alleged by the State that would together satisfy the "attempted to cause or caused serious bodily injury" element of the charge, including grabbing Officer Tucker by the throat while applying pressure to her trachea, biting her finger until it bled, and punching her in the face multiple times.  On the resisting arrest charge, the court listed the same acts but added "refusing to walk."  Defendant did not object to these instructions at the charge conference, and thus at first glance it would appear as though defendant did not preserve his objection for appellate review under Vermont Rule of Criminal Procedure 30 and that this Court must review for plain error.  V.R.Cr.P. 30(b) ("No party may assign as error any portion of the charge or omission therefrom unless the party objects thereto on the record either at a charge conference or before the jury retires to consider its verdict, stating distinctly the matter to which objection is made and the ground of the objection.").

¶ 21.     However, defendant did object to the trial court's answer to the question sent out from the jury's deliberations, in which the court explained that because the evidence presented was of a series of alleged actions that all happened during a very short period of time, the jury did not have to be unanimous on the specific acts that constituted the charge.  His objection was "a clear and concise recitation [that allowed the court] 'to understand what defendant intended to preserve

9

for appeal.' " State v. Rounds, 2011 VT 39, ¶ 19, 189 Vt. 447, 22 A.3d 477 (quoting State v. Wheelock, 158 Vt. 302, 306, 609 A.2d 972, 975 (1992)). Thus, the main goal of Rule 30—"to give the trial court one last opportunity to avoid an error"—was achieved because the court knew precisely what defendant argued was in error, had a chance to address it, and chose to give the instruction despite the objection. Wheelock, 158 Vt. at 306, 609 A.2d at 975. Therefore, instead of plain error review resulting from an unpreserved objection, this Court will review the initial instructions and the answer to the jury question as a preserved objection.

¶ 22. As explained above, the "party appealing [the] jury charge has the burden of establishing that the charge was both erroneous and prejudicial." Mobbs, 155 Vt. at 218, 583 A.3d at 571. Reading the instructions as a whole, we find no error because it "breathes the true spirit and doctrine of the law and does not mislead the jury." Pitts, 174 Vt. at 23, 800 A.2d at 483 (quotation omitted).

¶ 23. Defendant properly states it is a long-established rule that where there is evidence of many acts, any one of which would constitute the offense charged, an election must be made. See, e.g., State v. Blair, 109 Vt. 306, 307, 196 A. 242, 243 (1938) ("There can be no question but that the respondent was entitled to have the State elect as to which offense it relied upon."); State v. Bonilla, 144 Vt. 411, 413, 477 A.2d 983, 985 (1984) ("This Court has held, on numerous occasions, where there is evidence of many acts, any one of which would constitute the offense charged, an election must be made."). "This ensures a defendant's right to a unanimous verdict by protecting against the possibility that 'part of the jury will base its decision to convict on evidence of conduct different from that considered by the rest of the jury.' " State v. Albarelli, 2016 VT 119, ¶ 27, __ Vt. __, 159 A.3d 627 (quoting State v. Gilman, 158 Vt. 210, 215, 608 A.2d 660, 664 (1992)). However, this Court has held that there is an exception to the election rule in cases when the evidence reflects two or more such acts "where the specific acts are so related as to constitute but one entire transaction, or one offense." State v. Bailey, 144 Vt. 86, 98, 475 A.2d

1045, 1052 (1984). In <u>Bailey</u>, this Court held that, because the acts at issue "all occurred within the span of one and one-half hours," it would be "unreasonable to compel the prosecution and the . . . dazed victim to delineate with specificity each act . . . where she was being repeatedly and continuously . . . assaulted." 144 Vt. at 99, 475 A.2d at 1053 (quotations omitted). Cf. <u>Bonilla</u>, 144 Vt. at 414, 477 A.2d at 985 (requiring election between three acts of arson because they took place over three-day span); <u>State v. Corliss</u>, 149 Vt. 100, 103, 539 A.2d 557, 559 (1987) (finding that election was required between two distinct acts of burglary over course of several hours).

¶ 24.    Here, all of the alleged acts took place over a span of six minutes as part of one continuous assault—from this, it is clear that this case fits within the exception because the acts were "inextricably intertwined" as one continuous offense. Therefore, the trial court's initial instructions, which included a list of alleged acts that the court suggested the jury consider, and its answer to the jury question, which clarified that the jury did not have to elect specific acts and instead had to be unanimous that the element was proven beyond a reasonable doubt, was not in error. It breathed the true spirit of the law—that there is an exception to the election rule in multiple-act acts and that the evidence presented qualified this case for said exception—and thus we affirm.

        <u>Affirmed</u>.

                                        FOR THE COURT:


                                        _____
                                        Associate Justice

11