NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2020 VT 21

No. 2018-116

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Chittenden Unit, |
| | Criminal Division |
| | |
| David Gates | May Term, 2019 |

Dennis R. Pearson, J.

Sarah George, Chittenden County State's Attorney, Pamela Hall Johnson, Deputy State's Attorney, and Jacob Oblak, Legal Intern, Burlington, for Plaintiff-Appellee.

Matthew Valerio, Defender General, and Dawn Matthews, Appellate Defender, Montpelier, for Defendant-Appellant.

PRESENT: Reiber, C.J., Skoglund, Robinson, Eaton and Carroll, JJ.

¶ 1. **CARROLL, J.** Defendant appeals his conviction for first-degree aggravated domestic assault. He argues that the trial court denied him the right to a fair trial by refusing to grant immunity to his witness or to compel the State to do so. In addition, he submits that the trial court's supplemental instruction improperly pressured the jury to reach a verdict. We affirm.

¶ 2. Defendant was tried by jury over two days in August 2017 on four counts: first-degree aggravated domestic assault; second-degree unlawful restraint; interference with access to emergency services; and kidnapping.[1] The State relied on complainant's report that defendant

---

[1] Defendant was originally charged with a count of grossly negligent operation with serious injury resulting, but the State dismissed this charge prior to trial.

burned her with a cigarette to satisfy the bodily injury element of the aggravated-domestic-assault count.

¶ 3. At trial, defendant and complainant both testified. Complainant testified as follows. She and defendant dated in May and June 2016 and during that time defendant promised that he would divorce his wife. On July 2, 2016, the couple attended a party where both were drinking. They left in defendant's car to take a friend to the University of Vermont Medical Center (UVMMC). At UVMMC, complainant got upset when she noticed that defendant was texting his wife. She told defendant she was "done," and that she wanted to take her belongings out of his car. Complainant then described in detail a series of events that resulted in severe injuries to her. The two went outside to the parking lot, where their argument escalated. Defendant took complainant's purse and threw it over a construction fence. After she retrieved it, complainant and defendant continued to argue. At one point, defendant became physical and pushed her against a wall. Complainant walked away from the hospital, continuing to argue with defendant by text message and over the phone. She subsequently told defendant that she needed help when she began to have an anxiety attack. She texted him that she was near a baseball field, and then passed out.

¶ 4. Complainant woke up some time later to the sound of defendant's car. When she continued to lie still, he came over and pulled her partially up by her hair before kicking her. Defendant said he would help her, but that this was the end of their relationship. Still arguing with him, she got into the front passenger seat of his car. They continued to fight, and defendant burned complainant's chest with a lit cigarette. Defendant took complainant's cell phone so that she could not call her sister. Defendant got out of the car, and complainant chased after him. Defendant threw complainant's cell phone onto the ground and jumped on it, crushing it into several pieces. Defendant returned to the driver's seat. Complainant grabbed onto the driver's side door to try to keep him from pulling away with her purse and other belongings, and defendant kicked and shoved her with his left foot and arm. Defendant stepped on the gas and complainant let go when she

2

realized she was being dragged. Defendant hit the brakes just as his back tire rolled over complainant's right arm, causing her to scream. Defendant then came over to her, picked her up, and led her back to the passenger's seat.

¶ 5. Complainant believed that defendant was going to take her back to UVMMC on account of her injury, but instead he kept driving. He threatened to kill her and her dog and held a box cutter inches from her neck. When he stopped at a storage unit, he tried to force her out of the car. She refused to leave, thinking that she would be safer inside the car. When defendant got a phone call, complainant screamed for help; defendant hung up the phone right away, punched her twice in the head, and continued to drive.

¶ 6. Complainant asked defendant to take her to a restroom. He took her to a gas station in Richmond, but she refused to leave the car because he got out to accompany her to the restroom. After he saw her reach to grab his cell phone and her credit cards (which defendant had taken), defendant hit complainant in the head and threw a bottle at her. Believing this would be her last chance to escape before he took her home, where she feared he would kill her, complainant picked up the bottle and hit him with it as hard as she could before running out of the car and into the station. Once inside, she screamed that her boyfriend was trying to kill her. The attendant pulled her behind the counter, locked the door, and called the police. Complainant then remembers passing in and out of consciousness before waking up to emergency personnel asking her questions.

¶ 7. Defendant testified that he went to a party with complainant and had to leave to bring a friend to the hospital. He stated that complainant became angry when she saw him text "I love you" to his wife. Defendant admitted that he threw complainant's purse over a fence in the hospital parking lot. At this point, defendant's version of the events that evening differed significantly from complainant's. He generally alleged that complainant was drunk and caused her own injuries.

¶ 8. Defendant stated that he agreed to find complainant at the baseball field, and on his way, he ran into his friend, Christopher Edwards. Edwards climbed into the back seat of

3

defendant's car and they found complainant passed out at the baseball field. Defendant roused her and got her into the front seat of the car where she continued to complain about defendant's communications with his wife. Defendant began to drive, and complainant opened the car door and stepped out of the moving car. She fell, grabbing the side of the car with her left hand as she went down. Defendant, realizing that she was being dragged, stopped the car and got out to check on her. He found her crying on the ground and estimated that she had been dragged but did not see any injuries on her other than some road rash. She asked to go home. She did not say anything about defendant running over her arm.

¶ 9.    As they continued to drive, however, complainant said her phone had fallen out of the car, and she began yelling that she could not feel her arm and needed to go to the hospital. Then she told defendant that she needed to use the restroom and he took her to a gas station in Richmond. Once there, she said that she no longer needed to go, so defendant prepared to drive away. However, complainant then got out of the car, and when defendant asked her what she was doing, she responded that she was calling the cops. He asked her why and she said, "You'll see." At this point, not wanting to have an interaction with the police, and believing that he had done nothing "that warranted police," defendant left to drive Edwards home before going to visit his wife.

¶ 10.    Defendant's witness, Kristi Proper, testified on cross-examination that during a call on the night of the incident defendant told her that only he and complainant were in his car.

¶ 11.    On the second day of trial, prior to defendant's testimony, defendant notified the court of his intention to call Edwards as a witness. Counsel reported that Edwards had joined defendant during his travels between the hospital and the baseball field and would testify that "all of the things that [complainant] says are not true, or he'll testify to events that are different to the events that [complainant] testified, to an extent that both versions cannot be true." Counsel indicated that the State had noticed its intention to introduce global positioning system (GPS) evidence showing that Edwards, who was on furlough, was not with defendant on the night of the

4

incident because his GPS monitor placed him on St. Paul Street at the time in question. The defense sought a ruling from the court regarding the admissibility of the GPS evidence and whether the State would be permitted to cross-examine Edwards about his furlough supervision.[2]

¶ 12. In response, the State confirmed that the GPS evidence would show that Edwards was not in the vicinity of UVMMC and the baseball field during the time he would testify that he was. The State raised a concern that "either Mr. Edwards is going to admit to an escape, or Mr. Edwards is going to be perjuring himself" and suggested that the court provide him with legal counsel prior to testifying. The court inquired of the defense whether Edwards would testify he took off the monitor and left it on St. Paul Street. Counsel replied, "I think I would want to have a conversation with Mr. Edwards before I made a proffer to the court." The court appointed an attorney to consult with Edwards.

¶ 13. After meeting with Edwards, his attorney reported to the court that Edwards intended to invoke his Fifth Amendment right and refuse to testify if called as a witness. In response, defense counsel requested that the court immunize Edwards because "[h]is testimony is incredibly exculpatory information for my client" and "[goes] directly to the credibility of the complaining witness."

¶ 14. The State repeated its concern that Edwards would either incriminate himself on a felony escape charge, which the State would prosecute, or take the stand and perjure himself by lying about being with defendant. It refused to provide immunity to the witness, viewing the potential testimony, "in either scenario, to be an extremely serious and potentially, in the State's opinion, a very egregious violation against the integrity of the court." Defense counsel contested whether Edwards could be charged with felony escape, having allegedly been away from his

---

[2] The court had previously granted defendant's motion to exclude evidence of Edwards's criminal record and defense counsel argued that allowing mention of Edwards's furlough status would violate that order.

5

apartment for only two to three hours, and argued he would, at most, be subject to a furlough violation.

¶ 15.  The court denied defendant's request for court-ordered immunity.  It relied on 12 V.S.A. § 1664 and State v. Haner, 2007 VT 49, 182 Vt. 7, 928 A.2d 518, in concluding that only the State is authorized to request the court to order immunity for a witness.  The court explained:

> So here, where the court cannot immunize Mr. Edwards from the possible threat of prosecution for perjury, and where the State has indicated that it has GPS records which would potentially place him at a location far away, on St. Paul Street, from the Mobil station in Richmond, where it is alleged that he would testify he was present, the court believes that there are no policy rationale or reasons that would persuade the court that this court should go out on a limb and recognize an[] exception where even the Vermont Supreme Court has so far declined to do so.

¶ 16.  Defense counsel responded to the court's order, in part, by again describing the nature of the testimony Edwards would give, stating that "this testimony would be critically exculpatory, perhaps the most powerful and important information that the defense can present to the jury to contradict the testimony of the complaining witness."  Out of the presence of the jury, Edwards invoked his Fifth Amendment right and refused to testify about his involvement in any of the events of the case.

¶ 17.  After closing arguments, the court instructed the jury.  Several hours into deliberations, the jury sent a note indicating it was deadlocked on count one, the domestic-assault charge.  The court notified the parties that it would issue a "so-called Allen charge."  Defendant did not object.  The court then provided additional instructions to the jurors, urging them to make a good-faith attempt to reach a unanimous decision.  Again, there was no objection.  Forty-five minutes later, the jury returned with a guilty verdict on the first-degree aggravated-domestic-assault charge and not guilty verdicts on the remaining charges.

¶ 18.  Defendant filed a motion for judgment of acquittal or new trial, arguing that the court erred when it issued the supplemental charge to the jury.  The court denied the motion,

6

concluding that the supplemental charge did not violate any of defendant's fundamental rights. Defendant filed this appeal.

## I. Witness Immunity

¶ 19.    On appeal, defendant first argues that his due process right to present a defense was violated when the court refused to grant his witness immunity or to require the State to do so. Defendant submits that, despite the language in 12 V.S.A. § 1664, we should look to case law from other jurisdictions holding that the trial court may grant immunity to a defense witness in the rare instance that it is necessary.    Alternatively, he contends that the state's attorney engaged in prosecutorial misconduct either by withholding immunity from Edwards or by making threatening statements at trial, leading him to invoke his Fifth Amendment privilege.    Defendant argues that, because of this prosecutorial misconduct, the court should have required the State to grant Edwards immunity as a condition of continuing the prosecution of defendant.

¶ 20.    We review the legal questions of whether the trial court had the authority to confer immunity or compel the State to do so without deference to the trial court.    See State v. Gagne, 2016 VT 68, ¶ 13, 202 Vt. 255, 148 A.3d 986 (explaining that legal questions are reviewed without deference).    We review the trial court's application of the applicable test for abuse of discretion. See State v. Patten, 2018 VT 98, ¶ 4, 208 Vt. 312, 197 A.3d 873 (stating that trial court's discretionary decisions are reviewed for abuse of discretion); State v. Martinez, 189 P.3d 348, 355 (Ariz. 2008) (en banc) ("We review the denial of a motion to compel [witness to testify] for an abuse of discretion.").

## A. Judicial Immunity

¶ 21.    We first address defendant's argument that the trial court erred by refusing to grant defendant's witness judicial immunity. The statute governing witness immunity, 12 V.S.A. § 1664, provides for witness immunity only when requested by the prosecutor.    Although we have previously left unanswered the question of whether a court may, without the State's consent, extend

immunity to a third-party witness who invokes the right against self-incrimination, we now hold that it cannot.

¶ 22. The Legislature has provided that, "upon the request of the Attorney General or a State's Attorney," a court may compel a witness to testify notwithstanding the witness's assertion of the Fifth Amendment right against self-incrimination. 12 V.S.A. § 1664(b) (emphasis added). This Court has recognized that, with "few and limited" exceptions, "the power to grant witness immunity lies exclusively within the discretion of the prosecutor." Haner, 2007 VT 49, ¶ 7 (explaining that exceptions to State's exclusive authority to grant, or withhold, witness immunity "are few and limited in scope so as not to disrupt the separation of powers inherent in the Legislature's exclusive grant of authority to the Attorney General and state's attorneys").

¶ 23. We have recognized limited exceptions, crafting an exclusionary rule of sorts to enable defendants to testify in certain settings without waiving their right against self-incrimination. For example, we held that when a probation-revocation hearing is held before the criminal trial on the underlying offense, thereby putting "a probationer in the untenable position of choosing between [the] right to due process at the revocation hearing and [the] right to remain silent at criminal trial, the probationer's testimony may not be used against [the probationer] at trial." Id. ¶ 8 (citing State v. Begins, 147 Vt. 295, 297-98, 514 A.2d 719, 721-22 (1986)). We extended this rule to "a situation in which a sex offender who had testified at trial was required by [the] probation conditions to admit criminal responsibility at a treatment program, exposing [the offender] to potential perjury charges." Id. (citing State v. Cate, 165 Vt. 404, 415, 683 A.2d 1010, 1018 (1996)).

¶ 24. Both recognized exceptions involved a defendant "faced with the difficult choice of testifying and risking self-incrimination or remaining silent and forfeiting other important rights." Id. As we noted in Haner, this Court has been cautious in limiting the application of such judicially crafted immunity, even for defendants, and has never extended judicially crafted immunity to defense witnesses who invoke the privilege against self-incrimination. Id.

8

¶ 25. Haner recognized that the Third Circuit had crafted a judicial-immunity exception for third-party witnesses in Government of Virgin Islands v. Smith, 615 F.2d 964 (3d Cir. 1980), abrogated by United States v. Quinn, 728 F.3d 243 (3d Cir. 2013) (en banc). Haner acknowledged that the Smith approach had been "uniformly rejected by other federal circuit courts, as well as numerous state courts, that have addressed judicial use immunity." 2007 VT 49, ¶ 9 (citing Smith, 615 F.2d at 974). Because the facts of that case did not support application of such immunity, even assuming the Court adopted Smith, we declined to reach the question of "whether the Smith approach to judicial immunity is a sound one." Id.; see also State v. Hamlin, 146 Vt. 97, 107-08, 499 A.2d 45, 52-53 (1985) (declining to decide whether to adopt holding of Smith because Smith factors were not satisfied in any event).

¶ 26. Defendant now asks us to consider the question we did not reach in Haner: whether the court may extend immunity, without a request by the State, to a third-party witness who invokes the right against self-incrimination. We reject defendant's invitation to adopt Smith's holding that a court may do so in extraordinary circumstances. In so doing, we rely on the overwhelming weight of authority, including the Third Circuit's own abrogation of Smith's judicial -immunity framework.

¶ 27. In Smith, the Third Circuit held that a court has authority to compel the prosecution to extend use immunity to a defense witness in certain circumstances, and also described what it viewed as a court's inherent power to grant immunity to a witness where that witness will provide crucial exculpatory evidence. 615 F.2d at 969. The court identified two differences between such "judicial" immunity and an order compelling the prosecution to choose between granting immunity or facing dismissal of the charge as a response to prosecutorial misconduct. Id. at 968-69. "First, the need for 'judicial' immunity is triggered, not by prosecutorial misconduct or intentional distortion of the trial process, but by the fact that the defendant is prevented from presenting

9

exculpatory evidence which is crucial to [the defendant's] case." Id. at 969.  Second, "judicial" immunity is not achieved by any order requiring the prosecutor to provide statutory immunity.  Id.

¶ 28.    Smith laid out a five-part test for determining when the trial courts' ability to confer immunity was triggered, bearing in mind that the fundamental requirements of separation of powers necessitated that this extension of authority to the judiciary be subject to special conditions.  Id. at 971.  It required that, before a court could grant immunity to a defense witness, (1) the immunity must be properly sought in the trial court; (2) the witness must be available to testify; (3) the proffered testimony must be clearly exculpatory; (4) the testimony must be essential to the defense; and (5) there must be no strong countervailing governmental interest against the grant of immunity. Id. at 972.  When these conditions were satisfied, Smith held that a trial court had the authority to confer immunity on that witness.  Id. at 973-74.

¶ 29.    Every other circuit has rejected this approach.  See United States v. Serrano, 406 F.3d 1208, 1217 (10th Cir. 2005) ("Every other Circuit, save the Third, has . . . held a district court does not have the inherent authority to grant a defense witness use immunity."); accord United States v. Hunter, 672 F.2d 815, 818 (10th Cir. 1982) (concluding "that courts have no power to independently fashion witness use immunity under the guise of due process"), overruled on other grounds by United States v. Call, 129 F.3d 1402, 1404 & n.2 (10th Cir. 1997); United States v. Thevis, 665 F.2d 616, 639-40 (5th Cir. 1982) (stating that immunity issue involves balancing of public interests that should be left to executive branch), superseded by rule as stated in United States v. Nelson, 242 F. App'x 164, 171 (5th Cir. 2007).

¶ 30.    Eventually, the Third Circuit joined the other circuits in holding that "only the Government has statutory authority to seek immunity."  Quinn, 728 F.3d at 255.  Quinn reasoned that Congress assigned exclusive authority to grant immunity to the executive branch "because immunity is a prosecutorial tool."  Id. at 253.  The reasons to leave immunity decisions to the executive branch include that "the decision to grant or deny immunity impinges on the

10

Government's broad discretion as to whom to prosecute." Id. (quotation omitted). Because the government bears a heavy burden in a subsequent prosecution of proving that its evidence against an immunized witness was not obtained or derived from the immunized testimony, a court's grant of immunity to a witness may prevent the Government from ever prosecuting the witness for the criminal behavior at issue. Id. at 253-54. Prosecutors are in a better position than courts to evaluate such tradeoffs, as they can assess the strength of the case, its general deterrence value, and how it fits into the government's enforcement priorities and overall enforcement plan. Id. at 254. Significantly, the court also concluded that judicially crafted immunity as set forth in Smith was not necessary to protect the constitutional rights of the accused. Id. at 257. The court reasoned that doctrines proscribing prosecutorial misconduct and allowing courts to put prosecutors to a choice between immunizing a witness or having charges against a defendant dismissed can provide the necessary protection. Id.

¶ 31.    We are persuaded by the reasoning of Quinn and other courts that have rejected the judicial-immunity construct, and decline to adopt Smith's holding that a court has inherent authority to confer immunity on a witness in this context.

### B.  Compelled Statutory Immunity

¶ 32.    Defendant next argues that, even if the court's refusal to grant judicial immunity to Edwards was correct, it nonetheless erred by not compelling the State to grant him immunity. Defendant submits that the State engaged in misconduct when it threatened to bring escape charges against Edwards if he testified he was with defendant on the night in question and the State's interest in refusing to grant immunity to Edwards must give way to defendant's right to present eyewitness testimony. We conclude that defendant has failed to demonstrate that either basis provides grounds to compel the State to grant immunity to his witness.

¶ 33.    Defendants seeking to compel the State to grant immunity rely on the due process right to a fundamentally fair trial, which stems from both the Sixth Amendment and the Due

11

Process Clause of the U.S. Constitution. In general, "a defendant has no Sixth Amendment right to the testimony of a potential witness who has invoked the Fifth Amendment right against self-incrimination; therefore, the defendant has no Sixth Amendment right that could outweigh the Government's interest in using its immunity power sparingly." United States v. Moussaoui, 382 F.3d 453, 468 (4th Cir. 2004); United States v. Turkish, 623 F.2d 769, 773-74 (2d Cir. 1980) ("The established content of the Sixth Amendment does not support a claim for defense witness immunity. Traditionally, the Sixth Amendment's Compulsory Process Clause gives the defendant the right to bring his witness to court and have the witness's non-privileged testimony heard, but does not carry with it the additional right to displace a proper claim of privilege, including the privilege against self-incrimination."). When, however, the prosecution prevents a defendant from putting on exculpatory testimony, impairing a defendant's ability to present a defense, this can violate a defendant's right to due process. Quinn, 728 F.3d at 261-62. Therefore, when necessary to prevent a violation of due process, the court may properly put the prosecution to a choice of either granting immunity to a defense witness or facing dismissal of the charge. See United States v. Burke, 425 F.3d 400, 411 (7th Cir. 2005) (holding that while "court cannot order the government to immunize a defense witness, courts can dismiss an indictment where the prosecutor's refusal to grant immunity has violated the defendant's right to due process"); Moussaoui, 382 F.3d at 467 (noting that "[t]he Fourth Circuit, consistent with the majority rule, has held that a district court may compel the government to grant immunity upon a showing of prosecutorial misconduct and materiality").

¶ 34.   Although courts have generally rejected judicial immunity, many have embraced "the carrot-and-stick approach," under which the decision of whether to grant a witness immunity is left with the executive branch but the judiciary reserves the power to force the prosecution to choose between certain actions. Carter v. United States, 684 A.2d 331, 341 (D.C. 1996) (en banc) (quotation marks omitted). Essentially, courts threaten dismissal unless the prosecutor requests

immunity. Courts use different tests to determine when this remedy is warranted. Regardless of the test adopted, courts emphasize that this is an area of the law "requiring sensitivity," and that "absent a strong showing by the defense," courts should be hesitant to find that the State committed misconduct in denying immunity to a witness. Quinn, 728 F.3d at 260; see Blissett v. Lefevre, 924 F.2d 434, 441 (2d Cir. 1991) (emphasizing that courts should order immunity only in "extraordinary circumstances"). Not only are courts hesitant to interfere in a prosecutor's decision of whom to prosecute, but courts are cognizant of the need to "reduce the possibility of cooperative perjury between the defendant and his witness." Blissett, 924 F.2d at 442.

¶ 35.    There are generally two kinds of tests used: the deliberate-distortion test and the effective-defense theory. Under the former, courts focus on whether the government deliberately distorted the factfinding process by interfering with an important defense witness's free choice to testify. The Second, Fourth, and Ninth Circuits have developed tests that are, to some degree, hybrids of the deliberate-distortion test because they require a showing of prosecutorial overreaching or discriminatory immunization, and of the testimony's importance. See, e.g., United States v. Straub, 538 F.3d 1147, 1162 (9th Cir. 2008) (requiring that "for a defendant to compel use immunity the defendant must show that: (1) the defense witness's testimony was relevant; and (2) either (a) the prosecution intentionally caused the defense witness to invoke the Fifth Amendment right against self-incrimination with the purpose of distorting the fact-finding process; or (b) the prosecution granted immunity to a government witness in order to obtain that witness's testimony, but denied immunity to a defense witness whose testimony would have directly contradicted that of the government witness, with the effect of so distorting the fact-finding process that the defendant was denied his due process right to a fundamentally fair trial").

¶ 36.    The Third Circuit in Quinn also articulated a test that aims to determine when the prosecution has abridged the defendant's right to due process by improperly interfering with the defendant's ability to put on important testimony, even in the absence of obvious witness

13

intimidation or discriminatory immunization of witnesses. Some courts refer to this test as the effective-defense theory. See State v. Collymore, 148 A.3d 1059, 1075-76 (Conn. App. Ct. 2016), aff'd, __ A.3d __, 334 Conn. 431 (2020) (explaining that under "effective defense theory" immunity can be granted when court finds that "potential defense witness can offer testimony which is clearly exculpatory and essential to the defense case and when the government has no strong interest in withholding immunity" (quotation and alteration omitted)).

¶ 37. It is not necessary to decide in this case whether to adopt one of these tests because defendant has failed to meet the requirements of either test. There is no indication that the prosecutor's actions caused defendant's witness not to testify. Moreover, defendant has not demonstrated that the proffered testimony was clearly exculpatory.

i. Deliberate-Distortion Test

¶ 38. Even if prosecutorial misconduct that deliberately distorts the factfinding process could warrant forcing the State to elect between immunization of an important defense witness or dismissal, defendant has not demonstrated the necessary causal link in this case.

¶ 39. Defendant claims that the State improperly threatened to charge Edwards with a crime and dissuaded Edwards from testifying. Defendant asserts that the State's threat of charging Edwards with escape was based on a false understanding of the law because Edwards could not have been charged with felony escape where he was out of place for only a few hours. See 13 V.S.A. § 1501 (delineating terms of escape from custody).

¶ 40. Prosecutorial misconduct can include intimidation or threats designed to dissuade a witness from testifying or selectively immunizing prosecution witnesses to gain a tactical advantage. See United States v. Morrison, 535 F.2d 223, 229 (3d Cir. 1976) (holding that due process may require government to grant immunity "when prosecutorial misconduct caused the defendant's principal witness to withhold out of fear of self-incrimination testimony which would otherwise allegedly have been available to the defendant"). The defendant must, however, show a

14

"causal nexus" between the government's actions and the witness's decision not to testify to establish a due process violation. United States v. Angiulo, 897 F.2d 1169, 1193 (1st Cir. 1990); see People v. Stewart, 93 P.3d 271, 304 (Cal. 2004) (explaining that to demonstrate interference with right to compulsory process, defendant must show "causal link" between prosecution intimidation and witness's refusal to testify (quotation omitted)).

¶ 41. The evidence fails to demonstrate that the State's action threatened or intimidated Edwards into not testifying.[3] Although the State indicated, in the presence of Edwards's lawyer, that it would charge Edwards on the basis of his proffered testimony, the record does not support that this interchange led Edwards to invoke his right against self-incrimination. At the time of the prosecutor's remarks, Edwards's counsel had already informed the court that Edwards would invoke his right against self-incrimination if he testified. Before Edwards's lawyer said he would invoke the privilege, the prosecutor had said only, "It is our belief that either Mr. Edwards is going to admit to an escape, or Mr. Edwards is going to be perjuring himself. And if that's what we expect him to say, I think the Court should provide him with legal counsel prior to testifying." Neither Edwards nor the lawyer who was subsequently appointed to represent him were present for that remark, and moreover, the prosecutor's remark was appropriate; it seemed calculated to ensure only that Edwards had counsel to help him weigh his choice to testify, not to prevent him from testifying.

---

[3] Moreover, we reject defendant's inference that Edwards did not have a basis to claim a privilege against self-incrimination because his actions did not amount to a crime. The privilege is "confined to instances where the witness has reasonable cause to apprehend danger from a direct answer." Hoffman v. United States, 341 U.S. 479, 486 (1951). It is not necessary for the prospective witness to demonstrate that a prosecution will follow or that answers to questions will result in conviction. In re Hill, 149 Vt. 431, 435, 545 A.2d 1019, 1022 (1988) (per curiam). Moreover, "the trial judge should not speculate about or predict the likelihood of prosecution in relation to an assertion of the constitutional privilege against self-incrimination." Carter v. United States, 684 A.2d 331, 336 (D.C. 1996) (en banc) (indicating majority rule and citing cases). A trial court "may only assess the possibility of future prosecution not the probability." Id. at 337. Here, the trial court explained that Edwards was justified in enforcing his privilege because there were sufficient facts to indicate that he could be exposed to possible criminal charges. There is no indication that the court erred in so finding.

15

See L. Wenger, Annotation, <u>Admonitions Against Perjury or Threats To Prosecute Potential Defense Witness, Inducing Refusal To Testify, as Prejudicial Error</u>, 88 A.L.R.4th 388, § 2(a) (1991) (explaining that "[m]any courts have held that it is proper for a prosecutor or trial judge . . . to advise the witness of [the] constitutional right to counsel and privilege against self-incrimination" so long as it is not "calculated to dissuade the witness from testifying or to intimidate the witness" and is not "unnecessary since the witness had already been warned or was going to be warned by other means" (footnote omitted)). We conclude that the prosecutor's statements were not the cause of Edwards's invocation of his right against self-incrimination, and therefore reject defendant's argument that the State violated his right to due process on this ground.

## ii. Effective-Defense or <u>Quinn</u> Test

¶ 42. Moreover, we conclude that even under the <u>Quinn</u> test, defendant has failed to demonstrate that his witness was entitled to immunity. <u>Quinn</u> holds that a defendant can demonstrate a need to compel immunity for a witness by showing: (1) immunity was properly sought in the trial court; (2) the defense witness was available to testify; (3) the proffered testimony was clearly exculpatory; (4) the testimony was essential; and (5) there was no strong governmental interest countervailing against a grant of immunity. 728 F.3d at 261-62. Here, defendant has not met the burden of showing that the proffered testimony was clearly exculpatory.

¶ 43. To demonstrate that a witness's testimony is clearly exculpatory, defendant must show "that it would exonerate or free him of guilt or blame." <u>Id</u>. at 262. This is a high standard that demands more than simply showing that the evidence contradicts that offered by the State. <u>Clearly</u> exculpatory evidence does not include testimony that is "at best speculative, severely impeached by the witness's prior inconsistent statement(s), ambiguous on its face, or even if believed, would not in itself exonerate the defendant." <u>Id</u>. (alternation omitted) (citations and quotation omitted). Further, "defense evidence that is <u>overwhelmingly</u> undercut or undermined by substantial prosecution evidence in the record becomes so lacking in credibility that it cannot

16

be <u>clearly</u> exculpatory." <u>Id</u>. at 263. It is defendant's burden to "convince[] the court that the testimony is both clearly exculpatory and essential." <u>State v. Simpson</u>, 587 N.W.2d 770, 772 (Iowa 1998); see <u>Quinn</u>, 728 F.3d at 262 (explaining that "defendant must show" five elements, including that testimony is "clearly exculpatory"); <u>Carter</u>, 684 A.2d at 344 (reciting that "defendant must first establish to the trial court's satisfaction that the proposed testimony is (a) material, (b) clearly exculpatory, (c) non-cumulative, and (d) unobtainable from any other source").

¶ 44. Defendant has not satisfied his burden of showing that Edwards's testimony was clearly exculpatory because the proffered testimony was vague, overly speculative, and lacking in credibility. Defendant asserts that his attorney "explained in detail why Mr. Edwards' eyewitness testimony would be exculpatory for [defendant]," but no such specificity is provided in the record. Defendant made a very general proffer of what Edwards would say if he testified. Defendant offered that Edwards would testify that he was walking along the road, that defendant met him by chance on the way between the hospital and the baseball field, and that Edwards and defendant then went jointly to the baseball field where they discovered the complainant. Defense counsel proffered that Edwards would "testify that all of the things that [complainant] says are not true, or he'll testify to events that are different to the events that [complainant] testified, to an extent that both versions cannot be true."

¶ 45. This proffer was too vague and nonspecific to conclude that Edwards's testimony would have been clearly exculpatory, especially as to the single count for which defendant was convicted.[4] See <u>United States v. Triumph Capital Grp., Inc.</u>, 237 F. App'x 625, 630 (2d Cir. 2007) (concluding that defendant's speculation regarding how witnesses would have testified was "not sufficient to prove that their testimony would have been exculpatory"). The assault charge was based on the specific allegation that defendant had burned complainant with a cigarette.

_____

[4] We need not consider whether the proffer established clearly exculpatory evidence regarding the other counts because defendant was acquitted of those charges.

Complainant testified that after defendant found her at the baseball field, there was a physical altercation between them, both were screaming, and defendant promised to help her, so she got into the front seat of the car. She stated that they were yelling at each other in the car and defendant became so angry with complainant that he took a lit cigarette and put it out on her chest. She screamed loudly due to the pain this caused. There was other evidence at trial corroborating complainant's injury, including from a police officer, who testified that complainant had a cigarette burn on her chest later that evening.

¶ 46. Defendant's version of events differed dramatically. He testified that he picked up Edwards prior to going to the baseball field and that Edwards climbed into the backseat of the vehicle. After complainant got into the car, defendant stated that Edwards was sitting behind complainant. When asked about complainant's burn, defendant testified that he observed a burn on the complainant's chest but did not ask her about it.

¶ 47. As to this series of events, defendant's proffer does not lend any helpful indication of how Edwards's testimony would be exculpatory. Defendant's proffer did not specify what Edwards would say regarding defendant's actions inside the car and specifically as to the cigarette burn. Defendant claimed that Edwards would contradict everything that complainant said but it is not clear how Edwards could have seen whether defendant put the cigarette out on complainant's chest when defendant himself testified that Edwards was sitting directly behind complainant in the car. Defendant claimed in his testimony that he did not know how complainant got the cigarette burn. If Edwards testified similarly, this would not directly contradict complainant's testimony. Without more specificity as to what Edwards saw or heard in the car, there was no ability to evaluate the extent to which Edwards could exonerate defendant or to evaluate the consistencies or inconsistencies between Edwards's version and defendant's or complainant's.

¶ 48. In deciding whether testimony is clearly exculpatory, "the court may evaluate the credibility of the proffered evidence, and is not required to simply take it at face value." Haner,

18

2007 VT 49, ¶ 10. In <u>Haner</u>, we examined the prospective testimony of the defendant's witness and concluded it lacked credibility because it was made by someone with a close familial relationship to the defendant, was made several years after the defendant's conviction, and contained several inconsistencies with the testimony from other witnesses. <u>Id</u>. ¶¶ 11-13.

¶ 49. Here, the vague proffer of Edwards's testimony impairs evaluating its credibility. Because there were no specifics offered regarding what Edwards allegedly saw or heard from the backseat, there is no practical way to evaluate whether Edwards's testimony would have contradicted or corroborated the testimony of other witnesses. To the extent that the credibility of Edwards's testimony can be evaluated, his testimony is undermined by the context in which it arose and by the other evidence. See <u>People v. Hull</u>, 243 Cal. Rptr. 3d 375, 395 (Ct. App. 2019) (stating that evidence is not clearly exculpatory if it is " '<u>overwhelmingly</u> undercut or undermined by substantial prosecution evidence' " (quoting <u>Quinn</u>, 728 F.3d at 263)), <u>review denied</u> (May 1, 2019). The context of Edwards's corroboration of defendant's version of events is suspect because Edwards did not come forward until a couple of weeks before trial and defendant testified that Edwards was his close friend. Moreover, other evidence undercuts Edwards's claim. Another defense witness testified that when she spoke with defendant on the telephone that evening (during the time when defendant claimed Edwards was with him), defendant said that it was just him and complainant in the car. In addition, the State produced evidence that Edwards's ankle monitor showed that he was at a different location that evening. Given the vague proffer and the other indicia of lack of credibility, defendant did not meet his burden of showing that his witness's testimony would be clearly exculpatory.

¶ 50. Because we conclude that defendant failed to meet this criterion, we need not reach the question of whether the evidence was essential and noncumulative.[5] We note, however, that the record tends to indicate that the testimony was not essential because it was otherwise available. During the parties' discussions in the trial court, the State indicated that it had deposed Edwards on August 3. The parties made some general statements about the content of the deposition testimony but there is no indication in the record of what exactly Edwards said during his deposition and if this deposition could have provided an alternative to granting Edwards immunity. A witness who has asserted a Fifth Amendment privilege is unavailable to testify for purposes of Vermont Rule of Evidence 804(a)(2). State v. Roberts, 154 Vt. 59, 66-67, 574 A.2d 1248, 1251 (1990). When a witness is not available, deposition testimony may be admitted if it bears certain indicia of reliability. Id. It was defendant's burden to demonstrate that Edwards's testimony was clearly exculpatory, essential, and not cumulative. Therefore, the lack of information as to this factor operates against defendant.

¶ 51. Even if the testimony is exculpatory, essential, and noncumulative, the court may deny a request to compel immunizing a defense witness if there is a strong governmental countervailing interest. These reasons include when there is a clear indication of potential perjury or where the grant of immunity may impact future prosecution. Hayes v. United States, 109 A.3d 1110, 1117 (D.C. 2015). In this case, the State based its denial of immunity for Edwards in part on its assessment that there was a clear indication of potential perjury given the evidence that GPS data showed Edwards was not in the location he alleged on that night. We need not reach the question of whether the State had a strong countervailing interest for refusing to grant immunity

---

[5] Some courts have held that where a witness simply corroborates the testimony of the defendant, it is cumulative and does not require a grant of immunity. See, e.g., State v. Dixon, 716 S.W.2d 815, 818 (Mo. Ct. App. 1986). We need not reach this question.

to Edwards because we conclude that defendant did not meet his burden of showing that the testimony was clearly exculpatory.

## II. Supplemental Instruction

¶ 52. Defendant next contends that the jury was improperly coerced into reaching a verdict. He argues that the court's supplemental instruction implied that jurors had such a strong duty to reach a verdict that some should compromise their convictions to do so and suggested the minority should yield to the majority. See State v. Perry, 131 Vt. 337, 340, 306 A.2d 110, 112 (1973) (explaining attributes of impermissible supplemental charge). He argues that the circumstances of this case were such that we should conclude that the jurors were impermissibly pressured into coming to a verdict. We do not agree that the court improperly coerced the jury.

¶ 53. After closing arguments, the trial court instructed jurors to "not surrender your honest belief as to the weight or fact of the evidence, solely because of the opinions of your fellow jurors or for the mere purpose of returning a verdict." The jury then retired. It deliberated for several hours and reached a verdict on three out of the four charges but was unable to reach agreement on count one, the domestic-assault charge. Immediately prior to calling in the jurors, the court stated that it would issue a "so-called Allen charge" to encourage them to reach a verdict on the final issue.[6]

¶ 54. The court stated:

> [W]ith respect to Count I—I know it's late, it's 8:20 in the evening, it's been a very long day, but I'm duty bound to ask you to try one more time to see if you can talk through and work through whatever differences you may have with regard to Count I. As you've seen over the last two days, a lot of time and effort has gone into this process to get to this point. There's no guarantee that even if we were to do it all over again, that the evidence would come in any more clearly than it has—or not so clearly as it has during this trial. Every trial is an entity unto itself with unforeseen circumstances that arise, so there's no guarantee that the next time would make it any easier for a second jury. And another jury of twelve, fair-minded,

---

[6] This description comes from the case Allen v. United States, 164 U.S. 492, 501 (1896).

reasonable people like yourselves could easily struggle just as much with a decision as to Count I as you have, apparently, so far this evening. So I'm going to ask you to return to the jury room, and give it one more try to see if you can work through your differences and come to a unanimous verdict, whatever that may be, with regard to Count I. And if you've given a good-faith attempt at that, and you're still unable to reach a unanimous decision, then let the court officer know, and we'll proceed accordingly.

Forty-five minutes later, the jury reached a guilty verdict on the charge of domestic assault.

¶ 55. Defendant did not object either when the trial court said it would issue the "so-called Allen charge" or after delivery of the supplemental instruction. He challenged the instruction for the first time in a post-trial motion. Under Vermont Rule of Criminal Procedure 30, "[n]o party may assign as error any portion of the charge or omission therefrom unless the party objects thereto on the record either at a charge conference or before the jury retires to consider its verdict." V.R.Cr.P. 30(b). Because defendant made no such objection, we review the jury instruction for plain error. State v. Carter, 2017 VT 32, ¶ 6, 204 Vt. 383, 169 A.3d 225 ("Where there has been no objection to the instruction in the trial court as required by Vermont Rule of Criminal Procedure Rule 30, we review only for plain error.").

¶ 56. The instruction in this case was not error, let alone plain error. "Defendant bears the burden of presenting facts sufficient to support his claim that the verdict was coerced." State v. Pratt, 2015 VT 89, ¶ 36, 200 Vt. 64, 128 A.3d 883. This Court evaluates jury instructions in their full context. State v. Bolaski, 2014 VT 36, ¶ 19, 196 Vt. 277, 95 A.3d 460 ("We review jury instructions as a whole to ensure that they convey the spirit of the law and there is no fair ground to say that the jury was misled."); Perry, 131 Vt. at 340, 306 A.2d at 112 (holding that whether reversible error "can be predicated on the use of [an Allen] charge must be tested by the circumstances"). The full context here—including the supplemental charge, which did not possess the troublesome attributes of an Allen charge, the original jury instruction, which admonished the

jurors not to surrender their honest beliefs, and the timing of the verdict—does not support

defendant's claim that the jury was impermissibly pressured or coerced.

¶ 57.    The instruction here did not have the shortcomings of a true <u>Allen</u> charge.  In <u>Allen</u>

<u>v. United States</u>, the U.S. Supreme Court approved a charge that, as we noted in <u>Perry</u>, other courts

and commentators have since widely condemned.  131 Vt. at 339-40, 306 A.2d at 112 (citing <u>Allen</u>

<u>v. United States,</u> 164 U.S. 492 (1896)).  In <u>Allen</u>, the judge gave the jury a supplemental charge

that admonished them, among other things, "that it was their duty to decide the case if they could

conscientiously do so" and "that, if much the larger number were for conviction, a dissenting juror

should consider whether his doubt was a reasonable one which made no impression upon the minds

of so many men, equally honest, equally intelligent with himself," and "[i]f, upon the other hand,

the majority were for acquittal, the minority ought to ask themselves whether they might not

reasonably doubt the correctness of a judgment which was not concurred in by the majority."

<u>Allen</u>, 164 U.S. at 501.  As <u>Perry</u> notes, an <u>Allen</u> charge suffers from two interrelated ills.  First, it

seems to make jurors' duty to reach a verdict so strong an obligation that they must compromise

their convictions to do so.  131 Vt. at 340, 306 A.2d at 112.  Second,

> it similarly lays a burden on the minority of a divided jury not only
> to reexamine their position, which is proper, but seemingly to yield
> those convictions produced in them by the facts, when the same facts
> bring the majority to an opposite result.  Missing is a balanced
> appeal to the majority to reexamine the validity of their position, and
> an injunction not to abandon honest convictions merely to reach a
> verdict.

<u>Id</u>.

¶ 58.    The supplemental charge here did not emphasize the jurors' duty to reach a verdict,

let alone urge the jurors to sacrifice their convictions to do so.  In fact, the instruction reassured

the jurors that, if they were unable to work through their differences, they could let the court officer

know and they would "proceed accordingly."  Moreover, the charge did not single out the minority

23

jurors and pressure them to reconsider their position. Instead, the instructions asked all jurors to "give it one more try to see if you can work through your differences."

¶ 59. Although defendant cites Perry in support of his challenge, the Perry charge was similar to the one provided here, and we upheld the charge in that case. Id. at 341, 306 A.2d at 112-13. In Perry, after deliberating for several hours, the jury informed the court it was having problems. The court "interrupted, and reminded the jurors that a failure to reach a verdict brings about a mistrial, which puts the respondent and the state to the burden of a retrial, with no assurance that any other jury could do any better." Id. at 339, 306 A.2d at 111-12. The court then asked the jury "to deliberate another half hour to see if they could arrive at a verdict on either or both of the charges." Id. at 339, 306 A.2d at 112. We held that the instruction

> was not the Allen charge. It did not urge, in any way, the convictions be abandoned, or honestly held positions be accommodated, for verdict purposes. It merely called to the jury's view the undeniable fact that the responsibility of decision in this case is theirs, and of great importance to the parties, and justified their best efforts to avoid a failure to resolve the issues, if that was morally possible. This concern has been previously recognized as proper in our law.

Id. at 340, 306 A.2d at 112.

¶ 60. The court's reminders in this case that "a lot of time and effort had gone into this process to get to this point" and another jury might similarly struggle with the case were proper, like the reminder in Perry to use "their best efforts to avoid a failure." Id. Although the charge here did not contain the "injunction not to abandon honest convictions merely to reach a verdict," id., which is desirable, neither did the charge we upheld in Perry. In both cases, such a reminder— while it would have been best practice—was not critical because nothing the court said implied that any jurors should abandon honest convictions.

¶ 61. The surrounding context also does not indicate that the jury instruction had a coercive effect. Id. The trial court's initial instructions directed that jurors should not abandon their honestly held beliefs to reach a verdict, and further instructions did not contradict this. The

24

short duration of time between the supplemental instruction and the jury's final verdict does not demonstrate the jury was coerced. If a jury returns a verdict shortly following a potentially coercive charge, that could demonstrate the charge's coercive effect. See Lowenfield v. Phelps, 484 U.S. 231, 240 (1988) ("We are mindful that the jury returned with its verdict soon after receiving the supplemental instruction, and that this suggests the possibility of coercion."). Here, the trial court had instructed the jury in its initial charge to "take the time you feel is necessary to pass upon all the issues in the case and give it the consideration its gravity and importance deserve." After several hours of initial deliberations, forty-five minutes of additional deliberation is not so brief as to suggest that the supplemental charge had a coercive effect.

Affirmed.

FOR THE COURT:

_____

Associate Justice

¶ 62. **ROBINSON, J., dissenting.** Because I conclude the trial court should have compelled the State to either grant immunity or face a judgment of acquittal, I respectfully dissent.[7] I believe the Third Circuit's Quinn test best serves the purpose of compelled statutory immunity, and applying that test to the facts of this case, I conclude that defendant made a sufficient showing.

I. The Quinn Test

¶ 63. Whatever test this Court ultimately adopts for compelled statutory immunity must serve the competing values that shape its use. Courts have taken divergent approaches to determining when to impose compelled statutory immunity. For reasons set forth more fully below, I would adopt the test laid out by the Third Circuit in United States v. Quinn as the most

---

[7] I agree with the majority that the trial court properly declined to extend "judicial immunity" to defendant's witness in this case, and join in the majority's analysis of the trial court's charge urging the jury to keep deliberating.

25

developed example of a framework that balances the State's legitimate prosecutorial needs and a defendant's interest in an effective defense. See 728 F.3d 243 (3d Cir. 2013).

¶ 64. Courts generally agree that, in extraordinary situations where necessary to prevent a violation of due process, the court may properly put the prosecution to a choice of either granting immunity to a defense witness or facing dismissal of the charge. See United States v. Moussaoui, 382 F.3d 453, 467 (4th Cir. 2004) (noting that majority rule is that court may compel government to grant immunity upon showing of material prosecutorial misconduct).

¶ 65. This compelled statutory immunity is an attempt to balance a number of competing constitutional concerns. " 'It has long been recognized that the Executive Branch of government has exclusive authority and absolute discretion to decide whether to prosecute a case,' " and therefore, " '[t]o interpret the Fifth and Sixth Amendments as conferring on the defendant the power to demand immunity for co-defendants, potential co-defendants, or others whom the government might in its discretion wish to prosecute would unacceptably alter the historic role of the Executive Branch in criminal prosecutions.' " United States v. Straub, 538 F.3d 1147, 1156 (9th Cir. 2008) (quoting United States v. Alessio, 528 F.2d 1079, 1081-82 (9th Cir. 1976)).

¶ 66. But this " 'power the government possesses' " to decide whom to prosecute, and how to prosecute them, " 'may not be exercised in a manner which denies the defendant . . . due process,' " and it is the court's role to ensure due process. Id. at 1147, 1164, 1166 (quoting Alessio, 528 F.2d at 1082) (holding that prosecution's refusal to immunize sole defense witness who could have discredited testimony of immunized prosecution witness distorted factfinding process such that defendant was denied fair trial, and reversing conviction). The Fifth Amendment Due Process Clause and the Sixth Amendment together "guarantee[] criminal defendants a meaningful opportunity to present a complete defense." Crane v. Kentucky, 476 U.S. 683, 690 (1986) (quotation omitted). Part of this right to a meaningful opportunity to present a complete defense is a "right to present witnesses who will testify on [the defendant's] behalf." United States v.

Burke, 425 F.3d 400, 411 (7th Cir. 2005). The Sixth Amendment right to compulsory process to compel witnesses generally gives way when a witness subpoenaed by the defendant invokes the privilege against self-incrimination. Diggs v. Owens, 833 F.2d 439, 444 (3d Cir. 1987). But when the prosecution prevents a defendant from putting on exculpatory testimony, impairing the defendant's ability to present a defense, this can violate the defendant's right to due process. Quinn, 728 F.3d at 261-62.

¶ 67.    In such situations, the court may need to intervene to protect the defendant's right to due process. See id. at 252-53. In doing so, the court cannot directly order the government to immunize a defense witness, but can dismiss an indictment where a prosecutor's refusal to grant immunity violates defendant's due process rights. See Burke, 425 F.3d at 411. This respects the separation of powers: while it is the State's role to decide whom to prosecute and how to prosecute them, it is the court's role to safeguard defendants' constitutional rights. Dismissing the charges unless the witness is immunized is within the court's powers to ensure due process. And it ultimately "leaves prosecutorial decisions in the hands of the Government." Quinn, 728 F.3d at 260.

> [The State] may grant immunity to the witness and attempt to convict the defendant in a fair trial, or it may decide that denying the witness immunity is more important to its goals than seeking that conviction. But the remedy does not compel the Government to do anything. It simply prevents prosecutors from obtaining a conviction through a process that lacks the fairness afforded by due process.

Id.; see also Burke, 425 F.3d at 411 ("The prosecutor's broad discretion to refuse immunity is limited by the defendant's due process rights.").

¶ 68.    As the majority notes, courts have adopted two types of tests—the "deliberate-distortion" test that focuses on whether the government deliberately distorted the factfinding process by interfering with an important defense witness's free choice to testify, and the "effective-

27

defense" test that balances the prosecution's legitimate needs against the effect of the denial of immunity on a defendant's ability to mount a defense. Ante, ¶¶ 35-36.

¶ 69. Courts that apply a "deliberate-distortion" test focus on the subjective intentions of prosecutors. See, e.g., State v. Feaster, 877 A.2d 229, 239, 247 (N.J. 2005) (reversing and remanding where state had threatened key prosecution witness to prevent him from recanting in post-conviction relief proceeding); United States v. Angiulo, 897 F.2d 1169, 1192 (1st Cir. 1990) (noting that when prosecution "intimidate[s] or harass[es] potential defense witnesses to discourage them from testifying—for example, by threatening them with prosecution for perjury or other offenses"—and witness consequently refuses to testify, "court may order the prosecutor to grant immunity to the witness or face a judgment of acquittal"); United States v. Patterson, 819 F.2d 1495, 1506 (9th Cir. 1987) (noting that if defendant shows that prosecutors intentionally prevented defense witness from giving relevant testimony, "acquittal is required unless prosecution requests immunity for the witness at a new trial"); United States v. Morrison, 535 F.2d 223, 229 (3d Cir. 1976) (granting motion for new trial and ordering that at new trial, if defendant calls witness prosecutor previously threatened and witness invokes Fifth Amendment right not to testify, court shall enter judgment of acquittal unless government requests use immunity for her testimony).[8]

¶ 70. In Quinn, the Third Circuit adopted an alternative test that considers the impact on a defendant's right to a fair trial and the government's interests. 728 F.3d at 261-62. In particular, that court has established a multifactorial test under which: "(1) Immunity must be properly sought in the district court; (2) the defense witness must be available to testify; (3) the proffered testimony must be clearly exculpatory; (4) the testimony must be essential; and (5) there must be no strong

---

[8] Several courts have adopted hybrid versions of the "deliberate-distortion" test pursuant to which some nondeliberate acts such as selective grants of immunity may also support an order for compelled statutory immunity. See, e.g., United States v. Wilkes, 744 F.3d 1101, 1104-05 (9th Cir. 2014).

governmental interests which countervail against a grant of immunity." Id. (quotation and alteration omitted). The Third Circuit "does not require a defendant to show specific intent on the part of the Government to interfere with [the defendant's] due process rights" because the central "concern is with the effect of the prosecutor's actions on the process afforded to the defendant." Id. at 260.

¶ 71. Other courts have likewise adopted similar tests that do not require proof of deliberate distortion by a prosecutor. Arizona requires either proof of prosecutorial misconduct or "a showing that the witness would present clearly exculpatory evidence and that the state has no strong interest in withholding immunity." State v. Doody, 930 P.2d 440, 453 (Ariz. Ct. App. 1996); see also State v. Martinez, 189 P.3d 348, 356 (Ariz. 2008) (en banc) (quoting same). The District of Columbia requires a showing that "the defendant will not receive a fair trial in the absence of the proposed material, exculpatory, non-cumulative, and otherwise unobtainable testimony," and asks whether "the government has not provided a reasonable basis for refusing immunity." Hayes v. United States, 109 A.3d 1110, 1116 (D.C. 2015).

¶ 72. For several reasons, the Quinn test best promotes the purposes underlying compelled statutory immunity. The test is designed to "capture those situations where the Government, for tactical reasons, has used its power to threaten prosecution and withhold immunity to keep exculpatory and essential testimony from trial for no strong countervailing reason." Quinn, 728 F.3d at 259. Because it is difficult to show that a prosecutor's choice to withhold immunity is motivated by a "deliberate" intent to "distort" the facts, the "deliberate-distortion" test does not capture this class of cases, even though the impact on a defendant's ability to mount a defense is the same.

¶ 73. The point of compelled statutory immunity is to protect a defendant's right to a fair trial, not to punish prosecutorial overreach. As the Third Circuit reasoned in Quinn, "[t]he Due Process Clause addresses the defendant's right to a fair trial, not just whether the government

29

intended to deny the defendant his rights," and "[c]ourts should protect against deliberate wrongdoing by prosecutors and, in those rare cases where it arises, overzealous advocacy that distorts the factfinding function of a criminal trial." Id. at 260 (quotation omitted). The Ninth Circuit has likewise observed, in applying a somewhat different test, "compel[led] use immunity is not a sanction for prosecutorial misconduct; it is a vindication of the defendant's Fifth Amendment due process right to a trial in which the fact-finding process has not been distorted." Straub, 538 F.3d at 1161. "Because compelling use immunity is not a sanction for prosecutorial misconduct, it follows that the defendant need not prove that the prosecution acted intentionally to distort the fact-finding process where the [test's] other elements"—in Quinn, the relevance of the evidence and the prosecutor's selective immunization of witnesses that distorted the factfinding process—"are met." Id. This logic makes sense.

¶ 74. Moreover, the Quinn test, with its final requirement that there be no strong countervailing reason against the grant of immunity, protects the State's legitimate interests in investigating and prosecuting potential defense witnesses for crimes they have committed, and in ensuring that subsequent prosecutions are not hamstrung by requirements that the State demonstrate it has not made use or derivative use of immunized testimony. For these reasons, the test best serves both the needs of the defendant and the State.

## II. Application to this Case

¶ 75. Applying this test to the facts of this case, I conclude that defendant has satisfied the requirements of the Quinn test. I agree with the majority that defendant has not shown that the State substantially interfered with Edwards's choice to testify by threatening or intimidating him, ante, ¶ 41, but conclude that its refusal to grant Edwards immunity deprived defendant of due process.

¶ 76. Defendant has satisfied each element of the Quinn test. Defendant sought immunity for Edwards in the trial court. Edwards was available to testify. The proffered testimony

was clearly exculpatory,[9] and the testimony was essential. And finally, there was no apparent strong governmental interest countervailing against a grant of immunity.

¶ 77. With respect to the first element, defendant sought immunity in the trial court. The State notes that "[a]lthough [defendant] did not direct his immunity request to the prosecutor, her comments made clear that she would have refused to immunize Edwards if counsel had asked her." In general, defendants should ask the prosecution—not the court—for immunity for a defense witness. But given the unsettled nature of the law at the time of trial, and the fact that the State made it abundantly clear that it was "not . . . agreeable to providing any sort of immunity to Mr. Edwards for his testimony," defendant adequately laid the foundation to request immunity for Edwards.

¶ 78. Edwards was available to testify; the trial transcript reflects that he was in the courthouse waiting to testify. The State does not contest this point.

¶ 79. The proffered testimony was clearly exculpatory. Testimony is clearly exculpatory if "it would exonerate or free [the defendant] of guilt or blame. Testimony that is at best speculative, severely impeached by the witness's prior inconsistent statements, ambiguous on its face, or even if believed, would not in itself exonerate the defendant, is not clearly exculpatory." Quinn, 728 F.3d at 262 (quotations and alterations omitted). The defense attorney said:

> Edwards [would] testify that, on July 2nd, 2016, he was walking in the vicinity of the intersection of Colchester Avenue and Mansfield Avenue, and that Mr. Gates, en route between the hospital and Centennial Field, ran into Mr. Edwards, that Mr. Edwards got into the vehicle with Mr. Gates, that they together went to Centennial Field, where they discovered an unconscious [complainant].

He said Edwards would testify to being in the car not only at the baseball field, but also at the Richmond gas station. He said Edwards would "testify that all of the things that [complainant]

---

[9] This point is the crux of my disagreement with the majority.

31

says are not true, or he'll testify to events that are different to the events that [complainant] testified, to an extent that both versions cannot be true."

¶ 80.   If Edwards testified as the defense attorney said he would, this testimony would have been clearly exculpatory.  If Edwards said, as proffered, that he was present in the car from the time defendant picked up complainant at the baseball field to the time they parted ways at the Richmond gas station, and explained how the events of the night were very different from what complainant said happened, that testimony would "exonerate or free [the defendant] of guilt or blame."  Quinn, 728 F.3d at 262.  Although defendant's proffer did not break the witness's anticipated testimony down statement by statement, the information it did include indicated it would be exonerative.[10]  The proffer does not require substantial inferential leaps.  Cf. State v. Schreiner, 2007 VT 138, ¶ 28, 183 Vt. 42, 944 A.2d 250 (holding, in context of motion for new trial on basis of newly discovered evidence, that impact of proffered testimony was too speculative where inmate alleged that his cousin made an unspecific threat against an unnamed person in victim's town, but there was no evidence that cousin and victim ever met or that cousin ever went to victim's town).  This is not a case in which a defendant is merely speculating about what a witness would say if called.  It is clear from the record, including the State's representations, that Edwards had been deposed shortly before the trial.  Cf. In re Towne, 2018 VT 5, ¶ 40, 206 Vt.

_____

[10] The context of defendant's "proffer" is significant.  Defendant first described Edwards's anticipated testimony not because he was seeking immunity for the witness, but because he was seeking an order from the court prohibiting the State from impeaching the witness by referencing the witness's GPS ankle bracelet, which would, in turn, reveal that he was under Department of Corrections supervision.  That conversation segued into a request from the State to provide Edwards counsel before his testimony.  Later that morning, after Edwards conferred with counsel and, through that lawyer, invoked his Fifth Amendment privilege, defendant first raised the issue of immunity.  After a break to review the law, the trial court denied the request, ruling, correctly, that the court did not have authority to extend to judicial immunity.  The court did not address whether it could order the State to extend immunity or dismiss the charges, and the substance of the proffer (beyond the fact that it would subject the witness to potential jeopardy in connection with his furlough status) was not a subject of discussion among the court and parties.

615, 182 A.3d 1149 (holding, in context of post-conviction-relief petition, that petitioner's assertion that if defense counsel had interviewed specified witnesses they would have confirmed his alibi relied on speculation). Even Edwards's testimony that he had been in the car would have been, if not conclusively exonerative, highly valuable testimony for defendant: it would corroborate defendant's version of events and severely undercut complainant's, because defendant testified that Edwards was in the car and complainant did not.

¶ 81. The fact that Edwards's testimony would have been impeached by a defense witness's testimony and GPS records of Edwards's ankle monitor does not change my analysis. The State essentially argues that the trial court did not err in declining to order the State to grant immunity or dismiss the charges because Edwards's testimony would not have been credible. The jury is the "sole judge" of witnesses' credibility. State v. Robitille, 2019 VT 36, ¶ 34, __ Vt. __, 213 A.3d 437 (quotation omitted). As the "purpose of exculpatory evidence is to contradict the Government's evidence against" the defendant, it is "hard to imagine" a case in which a defendant's evidence of innocence is not undermined by the Government's evidence of guilt. Quinn, 728 F.3d at 262-63. "The existence of conflicting evidence does not affect, however, whether the defense evidence is exculpatory, though it may affect its weight." Id. at 263. "We have confidence that our courts and juries are capable of detecting falsehoods with the aid of the adversarial process," and thus even where a defense witness's testimony is called into some doubt, "it is not the function of the State to save a defense witness from himself or to spare the court a supposed falsehood, at the expense of denying the court critical testimony." Feaster, 877 A.2d at 244.

¶ 82. Of course, the "threat of a blatant perjury may sometimes be so apparent as to be demonstrable to the trial judge that the government could not reasonably be expected to cloak in advance such testimony with immunity." Young v. United States, 143 A.3d 751, 757 (D.C. 2016) (alterations and quotation omitted). "Thus, though exculpatory on its own, defense evidence that

33

is <u>overwhelmingly</u> undercut or undermined by substantial prosecution evidence in the record becomes so lacking in credibility that it cannot be <u>clearly</u> exculpatory." <u>Quinn</u>, 728 F.3d at 263. It was for that reason that in <u>State v. Hamlin</u>, 146 Vt. 97, 107-08, 499 A.2d 45, 52-53 (1985), this Court found "no need to pass on the applicability of" the <u>Smith</u> test in Vermont. See <u>Government of Virgin Islands v. Smith</u>, 615 F.2d 964 (3d Cir. 1980). In <u>Hamlin</u>:

> the proposed defense witness had "acknowledged freely and repeatedly that he had lied under oath and, even more significantly, that he felt lying was acceptable conduct. He admitted to lying during his sworn statements and during his depositions. In a chambers conference, the trial court summarized the situation: "[he] has made statements that are both exculpatory and inculpatory of [defendant]. I don't think there is one person in this room that knows what [he] would say if he got on that stand."

146 Vt. at 107-08, 499 A.2d at 52-53 (alteration omitted). Given the witness's propensity for lying and the possibility that his testimony would not be exculpatory at all, we concluded the defendant had not shown the testimony would be clearly exculpatory. <u>Id</u>. at 108, 499 A.2d at 53.

¶ 83. Likewise, we held in <u>State v. Haner</u> that the proffered testimony—the defendant's brother's confession to the sexual assault for which the defendant was convicted—was not clearly exculpatory. 2007 VT 49, ¶ 13, 182 Vt. 7, 928 A.2d 518. There were multiple inconsistencies between the brother's testimony and others': "throughout the pretrial investigations and trial, not a single mention was made of the brother's potential presence in the trailer at the time of the offense"; the "[d]efendant's son testified that he could not recall defendant's brother ever sleeping in his room[, but] defendant's brother claimed that he slept there on the night of the assault"; and although the victim "testified that she heard her assailant leave her room through a doorway to the hall and shortly thereafter saw defendant walk into the room, defendant's brother claimed that he hid at the foot of her bed as defendant entered the room." <u>Id</u>. ¶ 11. Additionally, we noted that the circumstances surrounding the confession diminished its credibility:

> Defendant's brother waited until approximately three years after defendant was first accused to come forward with his confession.

34

> By that time, defendant's appeal had been taken and denied, presenting the opportunity for his brother to tailor his confession to the facts and theories already on the record. Furthermore, defendant's brother acknowledged to the police that he was aware that, as a juvenile, he would be subject to a lesser punishment than defendant. When asked by the police why he waited so long to confess, defendant's brother answered that his sister-in-law "was trying to, um, she was the one that was trying to find out what to say, not what to say but um, where to go to report it."

Id. ¶ 12 (citation omitted). And "[f]inally, the familial relationship between defendant and his brother call[ed] into question the veracity of any exculpatory statements by defendant's brother," particularly because a sheriff's deputy "testified that during a July 2003 hearing she sat behind defendant's brother and two women who appeared to be his aunts. She overheard defendant's brother tell the women: 'We'll be all right as long as he doesn't do it again when he gets out.' " Id. ¶ 13. We held, "In light of the increased motive of close relatives to fabricate exculpatory evidence, the inconsistencies between the confession and witnesses' testimony, and the general circumstances surrounding the confession, we agree with the trial court that defendant failed to make a 'convincing showing' that the proffered testimony was 'clearly exculpatory.' " Id.

¶ 84. In contrast to Hamlin and Haner, where there were clear threats of perjury, here, the State represented it had evidence that could impeach Edwards's statements, but it did not clearly establish that Edwards's testimony would be perjury. A defense witness testified that she spoke to defendant on the phone sometime around 9:00 and 11:00 on the night of July 2, 2016, and that during the call he said it was just complainant in the car. Furthermore, counsel represented at trial that GPS records showed Edwards's Department of Corrections ankle monitor was at St. Paul Street at 10:00 on the night in question, and that the entries before and after that showed that the GPS was "unable to locate" the ankle monitor. The State argues this "show[ed] that Edwards was at a completely different location" than defendant and complainant. But neither piece of impeachment evidence is necessarily inconsistent with Edwards's proffered testimony—it was reasonably possible that the witness misunderstood defendant or misreported what he said, or that

35

defendant lied about being alone in the car; and it was entirely possible that Edwards had removed his ankle monitor. Absent any clear indication of perjury, the question of whether, and how much, to believe Edwards's exculpatory testimony should have gone to the jury.

¶ 85. Edwards's testimony was also essential. Apart from defendant's testimony, Edwards's testimony was the only evidence defendant had to contradict complainant's account of what happened in the car.[11] Moreover, there was a strong chance it might have been, as defendant puts it, "game changing." Out of the four counts—domestic assault by burning with a cigarette, unlawful restraint, kidnapping, and interference with access to emergency services—the jury acquitted on three, suggesting that it did not find complainant completely credible. Moreover, as reflected in the majority's opinion above, the jury deadlocked for some time on Count 1, the domestic-assault charge. The jury's struggle to reach a verdict on Count 1 suggests that if defendant had been able to introduce testimony corroborating his version of events and undercutting complainant's, there is a reasonable probability that the jury might have acquitted him on Count 1 along with the other charges.

¶ 86. Finally, the State did not present any strong countervailing interest against granting immunity. On appeal, the State argued "it had a strong interest in prosecuting Edwards for perjury if he lied at trial about being physically present during the charged offenses." This asserted reason does not actually countervail against allowing Edwards to testify, as the State is free to prosecute a witness for perjury committed in the course of giving immunized testimony. See 12 V.S.A. § 1664(a) (providing that immunity does not bar prosecution for perjury in immunized testimony). Moreover, as discussed more fully above, the proffered testimony is not so "overwhelmingly

---

[11] The record contains references to Edwards's uncounseled deposition testimony. However, the testimony is not itself in the record, and nobody made any proffers as to its content, so there is no basis to conclude that the deposition testimony would have served as an adequate alternative.

undercut or undermined by substantial prosecution evidence" that it is "so lacking in credibility that it cannot be clearly exculpatory." Quinn, 728 F.3d at 262-63 (emphasis omitted).

¶ 87.    We can imagine a wide range of scenarios that would countervail against a grant of immunity, such as where the State wishes to protect an ongoing investigation into or prosecution against the witness, or where the State has reason to believe co-conspirators are planning to falsely exonerate each other.  The State has not, however, articulated one here.

¶ 88.    The remedy for this due process violation "is a retrial where the Government can cure the distortion caused by its wrongdoing or face dismissal of the relevant charges."  Quinn, 728 F.3d at 248.  For that reason, I would reverse and remand for a new trial.

_____
Associate Justice